UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

- against -

ZVI GOFFER, et al.,

Defendants.

Criminal Docket No.

10-CR-0056 (RJS)

---

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF JOINT DISCOVERY MOTION

---

CYNTHIA M. MONACO
ANDERSON KILL & OLICK, P.C.
  ATTORNEYS FOR DEFENDANT ZVI GOFFER
1251 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK, NEW YORK  10020

JEFFREY HOFFMAN
HOFFMAN & POLLOK LLP
  ATTORNEYS FOR DEFENDANT JASON GOLDFARB
260 MADISON AVENUE, 22ND FLOOR
NEW YORK, NEW YORK 10016

MICHAEL ROSS
LAW OFFICES OF MICHAEL S. ROSS
  ATTORNEYS FOR DEFENDANT EMANUEL GOFFER
60 EAST 42ND STREET
FORTY-SEVENTH FLOOR
NEW YORK, NEW YORK  10165

ROLAND RIOPELLE
DIANE FERRONE
SERCARZ & RIOPELLE, L.L.P.
  ATTORNEYS FOR DEFENDANT DAVID PLATE
152 WEST 57TH STREET, 24TH FLOOR
NEW YORK, NEW YORK  10019

CATHERINE REDLICH
DRISCOLL & REDLICH
  ATTORNEYS FOR DEFENDANT ARTHUR CUTILLO
521 FIFTH AVENUE, SUITE 3300
NEW YORK, NEW YORK  10175

JANEANNE MURRAY
LAW OFFICES OF JANE ANNE MURRAY
  ATTORNEYS FOR DEFENDANT CRAIG DRIMAL
233 BROADWAY
NEW YORK, NEW YORK 11215

MICHAEL SOMMER
MORRIS FODEMAN
WILSON, SONSINI, GOODRICH & ROSATI, PC
  ATTORNEYS FOR DEFENDANT MICHAEL
  KIMELMAN
1301 AVENUE OF THE AMERICAS
FORTIETH FLOOR
NEW YORK, NEW YORK  10019

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION .................................................................................................... 1

ARGUMENT ............................................................................................................ 4

I.    THE GOVERNMENT SHOULD BE ORDERED TO PROVIDE
PARTICULARS CONCERNING THE ALLEGED INSIDER TRADING ...................... 4

    A.    Introduction ............................................................................................ 4

    B.    Bills of Particulars Generally ................................................................. 4

    C.    Bills of Particulars in Insider Trading Cases ......................................... 6

    D.    The Government Should Be Directed to Provide Particulars as to
the Inside Information at Issue ............................................................... 8

        1.    3Com ............................................................................ 8

        2.    Axcan .................................................................................. 10

        3.    Kronos ................................................................................ 10

        4.    Hilton ................................................................................. 11

        5.    Uncharged Stocks ............................................................... 12

II.   THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE
DOCUMENTS RELATING TO COMPLIANCE WITH TITLE III ............................ 13

    A.    Introduction .......................................................................................... 13

    B.    The Government's Wiretap Surveillance Violated Title III ................... 14

    C.    The Court Should Order the Production of Documents Relating to
the Government's Compliance with Title III ......................................... 16

III.  THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE
BRADY & GIGLIO NECESSARY FOR SUPPRESSION MOTIONS .......................... 17

**TABLE OF CONTENTS**
(continued)

Page

IV.   THE GOVERNMENT SHOULD BE ORDERED TO PROVIDE
      ADDITIONAL RULE 16 DISCOVERY TO ASSIST IN PREPARING
      MOTIONS AND FOR TRIAL ........................................................................ 19

      A.    Introduction ........................................................................................... 19

      B.    The Requested Materials Should be Disclosed Pursuant to Rule 16 .................... 20

      C.    The Requested Materials ........................................................................ 22

            1.    Outstanding Consensual Recordings .......................................... 22

            2.    The "Galleon Wiretap" ............................................................. 23

V.    THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE
      MATERIALS IN THE POSSESSION OF THE SEC .................................... 24

CONCLUSION .................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001).................................................................................................14

*Carlin Equities Corp. v. Offman,*
  2008 WL 4387328 (S.D.N.Y. September 24, 2008).........................................................10

*Dirks v. SEC,*
  463 U.S. 646 (1983).................................................................................................11

*Franks v. Delaware,*
  438 U.S. 154 (1978).................................................................................................18

*Kyles v. Whitley,*
  514 U.S. 419 (1995).................................................................................................27

*SEC v. Saad,*
  229 F.R.D. 90 (S.D.N.Y. 2005) ...................................................................................25

*Scott v. United States,*
  436 U.S. 128 (1978).................................................................................................13

*Smith v. Black,*
  904 F.2d 950 (5th cir. 1990), vacated on other grounds, 503 U.S. 930  (1992) ...............18

*Taylor v. First Union Corp. of South Carolina,*
  857 F.2d 240 (4th Cir. 1988) ..............................................................................9, 10

*In re U.S.,*
  10 F.3d 931 (2d Cir. 1993).........................................................................................15

*United States v. Alfonso,*
  143 F.3d 772 (2d Cir.1998).........................................................................................13

*United States v. Avellino,*
  136 F.3d 249 (2d Cir. 1998).......................................................................................27

*United States v. Barnes,*
  158 F.3d 662 (2d Cir. 1998).........................................................................................6

*United States v. Barton,*
  995 F.2d 931 (9th cir. 1993) .....................................................................................18

*United States v. Bergonzi,*
  216 F.R.D. 487 (N.D. Cal. 2003)...............................................................................21

*United States v. Bin Laden,*
  92 F. Supp. 2d 225 (S.D.N.Y. 2000)............................................................................5

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Bortnovsky,*
    820 F.2d 572 (2d Cir.1987)..................................................................................5, 7

*United States v. Bryan,*
    868 F.2d 1032 (9th Cir. 1989) ...................................................................................27

*United States v. Cannone,*
    528 F.2d 296 (2d Cir. 1975)......................................................................................22

*United States v. Joseph Contorinis,*
    09 Cr. 1083 (RJS) (May 5, 2009 Order) ....................................................................7

*United States v. Cusimano,*
    123 F.3d 83 (2d Cir.1997)...........................................................................................6

*United States v. Davidoff,*
    845 F.2d 1151 (2d Cir. 1988).......................................................................................5

*United States v. Delia,*
    944 F.2d 1010 (2d Cir. 1991).....................................................................................22

*United States v. Fletcher,*
    74 F.3d 49 (4th Cir. 1996) .........................................................................................22

*United States v. Giffen,*
    379 F. Supp. 2d 337 (S.D.N.Y. 2004)..................................................................22, 28

*United States v. Gigante,*
    538 F.2d 502 (2d Cir. 1976).......................................................................................16

*United States v. Giordano,*
    416 U.S. 505 (1974).......................................................................................13, 15, 18

*United States v. Hankins,*
    872 F. Supp. 170 (D.N.J. 1995) ................................................................................25

*United States v. Jackson,*
    850 F. Supp. 1481 (D. Kan. 1994).............................................................................27

*United States v. Jennings,*
    960 F.2d 1488 (9th Cir. 1992)...................................................................................25

*United States v. Lloyd,*
    992 F.2d 348 (D.C. Cir. 1993)...................................................................................21

*United States v. Marion,*
    535 F.2d 697 (2d Cir. 1976).......................................................................................16

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. NYNEX Corp.*,
781 F. Supp. 19 (D.D.C. 1991) .................................................................28

*United States v. Nacchio*,
No. 05-CR-00545, 2006 WL 2475282 (D.Colo. 2006) ...................................6, 7

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000).............................................................7

*United States v. Panza*,
750 F.2d 1141 (2d Cir. 1984)....................................................................5

*United States v. Poindexter*,
727 F. Supp. 1470 (D.D.C. 1989) ...........................................................22, 27

*United States v. Rodriguez*,
968 F.2d 130 (2d Cir. 1992).....................................................................14

*United States v. Royer*,
549 F.3d 886 (2d Cir. 2008).....................................................................9

*United States v. Santoro*,
647 F. Supp. 153 (E.D.N.Y. 1986), *rev'd sub nom on other grounds*, 845 F.2d
1151, 1155 (2d Cir. 1988)........................................................................6

*United States v. Scruggs*,
583 F.2d 238 (5th Cir. 1978) ...................................................................27

*United States v. Simels*,
No. 08-CR-640 (JG), 2009 WL 1924746 (E.D.N.Y. July 2, 2009)..............14, 15

*United States v. Stein*,
488 F. Supp. 2d 350 (S.D.N.Y. 2007)..........................................................21

*United States v. Stevens*,
985 F.2d 1175 (2d Cir. 1993).................................................................21, 23

*United States v. Torres*,
901 F.2d 205 (2d Cir. 1990).....................................................................5

*United States v. Upton*,
856 F. Supp. 727 (E.D.N.Y. 1994) .............................................................27

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999).......................................................................5

*United States v. Wood*,
57 F.3d 733 (9th Cir. 1995) .....................................................................25

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Zanfordino,*
    833 F. Supp. 429 (S.D.N.Y. 1993) ......................................................................................21

### STATUTES

18 U.S.C. § 2516(1) ..........................................................................................................15

18 U.S.C. §§ 2518 ............................................................................................................18

18 U.S.C. § 2518(1) ..........................................................................................................15

18 U.S.C. § 2518(8) ..........................................................................................................16

18 U.S.C. § 2518(8), (d) ....................................................................................................15

Fed. R. Crim. P. 16 .....................................................................................................21, 22

Fed. R. Crim. P. 16(a)(1)(E) ........................................................................................21, 22, 23

Title III of the Omnibus Crime Control and Safe Streets Act of 1968,
    18 U.S.C. §§ 2510-2522 ("Title III")................................................................... *passim*

## INTRODUCTION

This case - the first insider-trading case in which a wiretap was obtained - raises fundamental questions about what constitutes insider trading and how courts should permit that crime to be investigated.

Congress intended that wiretaps be used only where other investigative tools are inadequate. Despite a wealth of other avenues for discerning a trader's knowledge and intent – such as real-time instant messages and e-mails sent from their trading screens – the government relentlessly employed wiretaps over an eight-month period authorized by no less than twelve judges in this district. Not once did the government reveal in successive applications and progress reports that the wiretaps were proving to be a dead-end. Indeed, although touted as a case that exposed hedge fund traders with an "illegal edge,"[1] the wiretap evidence obtained in this case reveals traders with no edge at all. Not surprisingly, then, all but one of the trades at issue in the Indictment predate the wiretap period. Equally egregious, the government made no effort to comply with Title III's monitoring and minimization requirements, intercepting scores of irrelevant and inappropriate calls.

An analysis of the pre-wiretap trades at issue in the Indictment reveals further flaws in this prosecution. Although the government claims that the defendants traded certain stocks on the basis of material nonpublic information obtained in violation of a fiduciary duty, investigation and analysis of public and other documents obtained in discovery reveal an entirely different picture. Much of the supposed "inside" information was available in the public sphere or was the subject of independent research. Moreover, in many instances, the defendants were

---

[1]   *See* New York Times Report, November 6, 2009, reporting U.S. Attorney Preet Bharara's remarks at press conference announcing arrests in this case, available at http://www.nytimes.com/2009/11/06/business/06network.html?_r=1&sq=drimal%20goff er&st=cse&adxnnl=1&scp=1&adxnnlx=1275076883-QcNdXZYlryDamZ65KnvZJA, attached as Exhibit A.

downstream tippees by multiple levels, rendering it next to impossible to prove knowledge of the source of the information in question.

The defendants intend to file an extensive set of pretrial motions addressing the deficiencies in the Indictment and the investigation outlined above.  In this motion, defendants respectfully request that the Court order the government to provide certain particulars and discovery, to assist in the preparation of those formal pretrial motions.

## BACKGROUND

On November 15, 2007, the government applied for and received authorization pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 ("Title III"), to intercept the telephone calls of defendant Craig Drimal, based in large part on allegations made by cooperator David Slaine.  *See* Affidavit in Support of Application for Authorization to Intercept Wire Communications, dated November 15, 2007, attached as Exhibit B.  With almost no effort at seeking less intrusive alternative means of investigating the alleged wire fraud and money laundering charges the prosecutors claimed to be pursuing, the government set out on a juggernaut of Title III applications.  Each application to the authorizing judge represented that inside information was being passed in the intercepted and monitored conversations, when an extraordinary amount of available data and communications would have belied these claims.  The government received permission to intercept telephone calls of Craig Drimal, Zvi Goffer, Jason Goldfarb, Gautham Shankar, and Thomas Hardin, between November 15, 2007 and July 14, 2008.  Attached as Exhibit C is a chart summarizing the Title III applications and progress reports.  After eight months of wiretaps, only one transaction charged in the Indictment – a purchase of Axcan by David Plate on November 21,

2007 – occurred during the monitoring period, specifically during the first week of the Drimal wiretap.

The Indictment charges the defendants with criminal involvement in two overlapping insider-trading conspiracies. Count One alleges a conspiracy between in or about 2007 through in or about 2008, in which the defendants tipped or were downstream tippees of information allegedly misappropriated from Ropes & Gray in connection with the acquisitions of 3Com by Bain Capital and its affiliates on September 28, 2007 and Axcan by TPG Capital and its affiliates on November 29, 2007. According to the allegations contained in the Indictment, the criminal complaint in *United States v. Zvi Goffer, et al.*, 09 Mag. 2438 (THK) ("Criminal Complaint"), and the complaint in *Securities and Exchange Commission v. Cutillo et al.*, 09 Civ. 9208 (RJS) ("S.E.C. v. Cutillo Complaint"), cooperator Brien Santarlas passed information from Ropes & Gray to other downstream tippees.

Count Two of the Indictment alleges a second, overlapping conspiracy between 2006 and 2008 with all defendants except for Arthur Cutillo in the role of conspiring to acquire information from Gautham Shankar. According to allegations contained in the Indictment, the Criminal Complaint, and the complaint in *Securities and Exchange Commission v. Galleon Management, LP, et al.*, 09 Civ. 8811 (JSR) ("S.E.C. v. Galleon Complaint"). The charged defendants were downstream tippees of information, obtained from ratings agency Moody's and/or a "roommate," and misappropriated by fugitive Deep Shah, who provided that information to cooperator Roomy Khan, who in turn, provided that information to cooperator Thomas Hardin, who in turn, provided that information to cooperator Gautham Shankar, who in turn, provided that information to Zvi Goffer, Craig Drimal, Emanuel Goffer, Michael Kimelman, David Plate and others. The Moody's information allegedly concerned material

nonpublic information on the stocks of Hilton, which was the target of a takeover by the Blackstone Group, on July 3, 2007; and Kronos, which was the target of a takeover by Hellman & Friedman, on March 23, 2007. No substantive counts of actual trades in Hilton or Kronos stock are alleged in the Indictment. Counts Three through Nine allege substantive trades and aiding and abetting liability of the defendants in 3Com on August 7, 2007, September 17, 2007, and September 21, 2007 in Axcan on November 21, 2007.

Because the government has failed to meet its obligations to provide information necessary for the defendants to prepare motions and for trial, the defendants jointly move for an order compelling the production of the requested particulars and discovery.

## **ARGUMENT**

I.   THE GOVERNMENT SHOULD BE ORDERED TO PROVIDE PARTICULARS
     CONCERNING THE ALLEGED INSIDER TRADING

    A.   Introduction

As discussed below, we respectfully submit that the government should be directed to provide a bill of particulars, specifying the precise material, nonpublic information allegedly provided with respect to each of the stocks named in the Indictment or otherwise to be relied on by the government at trial; the individuals who were the sources or intermediate sources of the information; the duty(ies) allegedly breached; and the trades made based on the information. Whether information is "material" or "nonpublic" is a fact-intensive issue that will be among the central disputes at trial. In order properly to understand the charges against them and effectively to prepare pre-trial motions and for trial itself, the defendants are entitled to the requested particulars.

    B.   Bills of Particulars Generally

A bill of particulars is appropriate to permit a defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant

to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be

prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574

(2d Cir. 1987) (citations omitted) (*per curiam*). While the decision to grant a bill of particulars

rests within the sound discretion of the district court, *United States v. Panza*, 750 F.2d 1141,

1148 (2d Cir. 1984), a bill of particulars is required, "where the charges of the Indictment are so

general that they do not advise the defendant of the specific acts of which he is accused." *United*

*States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (*quoting United States v. Torres*, 901 F.2d 205,

234 (2d Cir. 1990)). Moreover, the need for a bill of particulars is not obviated by the provision

of voluminous discovery. The Second Circuit has made clear that the government does "not

fulfill its obligations merely by providing mountains of documents to defense counsel who were

left unguided" as to the nature of the charges pending. *Bortnovsky*, 820 F.2d at 575; *see also*

*United States v. Davidoff*, 845 F.2d 1151, 1155 (2d Cir. 1988) (production of voluminous

discovery materials is not "an adequate substitute for a straightforward identification in a bill of

particulars of identity of victims or offenses that the prosecution intends to prove"); *United*

*States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) ("It is no solution to rely solely on

the quantity of information disclosed by the government; sometimes, the large volume of

material disclosed is precisely what necessitates a bill of particulars.").

   Notably, the fact that a bill of particulars may reveal the government's evidence

or theories of prosecution is irrelevant if the defendant is entitled to the requested information.

As the Second Circuit has noted, "if necessary to give the defendant enough information about

the charge to prepare his defense, a bill of particulars will be required even if the effect is

disclosure of the government's evidence or theories." *See United States v. Barnes*, 158 F.3d 662,

665 (2d Cir. 1998).

C.   Bills of Particulars in Insider Trading Cases

Here, the government has premised its prosecution on the "misappropriation theory" of insider trading, which requires proof that trading involved "material, non-public information that has been gained in violation of a fiduciary duty to its source." *United States v. Cusimano*, 123 F.3d 83, 87 (2d Cir.1997). In cases such as this, courts have routinely directed the government to particularize the material, non-public information at issue. Thus, in *United States v. Santoro*, 647 F.Supp. 153 (E.D.N.Y. 1986), *rev'd sub nom on other grounds*, 845 F.2d 1151, 1155 (2d Cir. 1988), the court ordered the government to describe "as specifically as possible" the information referred to in an Indictment charging the defendants with supplying or receiving "confidential, material, nonpublic information relating (a) to the proposed merger of AEI and CF Air Freight in 1983, and (b) to litigation between AEI and Teamsters Locals 295 and 851 concerning the proposed merger of AEI and CF Air Freight in 1983." *Id.* at 188. The court explained "*a defendant cannot be expected to defend against a charge of insider trading without knowing what the inside information is.*" *Id.* (emphasis added).

Similarly, as outlined in a detailed opinion, the court in *United States v. Nacchio*, No. 05-CR-00545, 2006 WL 2475282 (D.Colo. 2006), directed the government to specify "all material nonpublic information [about the business of Quest Communications International, Inc.] that the Government claims [defendant] was aware of between December 4, 2000 and September 10, 2001 . . . because the Indictment right now simply charges that he was aware of this information without saying *when he became aware of it* or without *tying it to any particular count in the Indictment.*" *Id.* at *6 (emphasis added). The court found the government's bill of particulars in compliance with its order only where it "set[] forth in sufficient detail the material nonpublic information the Government intends to rely upon," including specific information as to "material risks to achieving Quest's 2001 [financial] targets," forecasts of declining

nonrecurring revenues, and "actual results of Quest's business operations," as well as "specific examples of when Defendant obtained the material nonpublic information, from whom he acquired the information," and "the sources which contain examples of the material nonpublic information upon which the Government relies." *Id.*

Indeed, this Court, acknowledging the importance of particulars, ordered the government to provide a bill of particulars in an insider trading case, *United States v. Joseph Contorinis,* 09 Cr. 1083 (RJS) (May 5, 2009). In *Contorinis,* this Court's Order, dated May 5, 2010, thus required that the government "shall submit a bill of particulars with respect to material, non-public information allegedly disclosed in the Albertson's transaction."

The government's refusal here to identify the precise material, non-public information at issue is no more permissible than charging a defendant with making a false insurance claim without identifying the claim at issue, or of making a fraudulent misstatement without specifying what the statement is. *Cf. Bortonovsky*, 820 F.2d at 574 (concluding that "appellants were hindered in preparing their defense by the district court's failure to compel the Government to reveal crucial information: the dates of the fake burglaries and the identity of the . . . fraudulent documents"); *United States v. Nachamie*, 91 F.Supp.2d 565, 571 (S.D.N.Y. 2000) (in Medicare fraud prosecution, defendants were entitled to know "which . . . claims were false and in what way they were false"). Due process does not permit trial by guesswork or speculation.

D.     The Government Should Be Directed to Provide Particulars as to the Inside
       Information at Issue

As required in *Santoro, Nacchio*, and *Contorinis*, the government should be

directed to particularize the precise material, non-public information at issue in this case.[2] The

need for particularization is especially compelling here where for many of the stocks at issue, the

defendants are alleged to be downstream tippees by multiple levels (the Kronos and Hilton tips,

for example, are alleged to have been passed through no less than five individuals before

allegedly reaching the Schottenfeld traders Zvi Goffer and David Plate), and where information

concerning many of the acquisitions at issue was already in the public domain.  Traders are

literally *in the legitimate business of* conducting analysis, collecting information, listening to the

theories of colleagues, and attempting to separate what is a credible "idea" from what is faulty

analysis, corporate hype, or even deliberate misinformation.  Because it is the essence of a

trader's work to piece together information available in the financial and commercial

community, the defendants should be entitled to know *which* of the thousands of "tips" they

heard daily from 2006 through 2008, are alleged to have been, in fact, misappropriated inside

information and which of the hundreds of trades they were conducting were alleged to have been

based on that information.  Indeed, the core of the defendants' trial defense will be that none of

the trades were made on the basis of such information.

1.     3Com

The defendants promptly requested particulars on all stocks.  *See* Letters of

Cynthia M. Monaco, dated April 5, 2010, and April 16, 2010, attached as Exhibits D and E,

respectively.  The only information provided by the government about the alleged 3Com inside

---

[2]     It is important to note that despite the voluminous production to date, including thousands
of intercepted calls, none of this discovery sheds any light on the inside information at
issue in the Indictment, since the bulk of these recordings post-date the trades at issue in
the Indictment.

information is that "[i]n or about July or August 2007, Cutillo and Santarlas told Goldfarb that

Ropes & Gray was working on the acquisition of 3Com Corporation;" they provided him with

"pricing information" and "periodically updated Goldfarb on the progress of the transaction until

it was publicly announced." *See* Letter of AUSAs Andrew Fish and Reed Brodsky, dated April

27, 2010, at 2, attached as Exhibit F.  The government fails to indicate exactly when this

information was imparted, and precisely what pricing and updates were provided, and from what

source document or communication Mr. Santarlas acquired the information.  Since the Wall

Street Journal had already reported as early as July 17, 2007, that 3Com had been approached by

Silverlake Partners and Bain Capital with a buyout deal, the timing of such information is critical

to defending against the charge.

*See http://blogs.wsj.com/deals/2007/07/17/3Com-draws-buyout-interest/*, attached as Exhibit G.

Without knowing precisely *what* allegedly material, nonpublic information was

provided from Ropes & Grays client files, and *when*, it is impossible to determine if the

information was already in the public realm and therefore, by definition, not an appropriate

predicate for an insider trading charge.  *See United States v. Royer*, 549 F.3d 886, 898 (2d Cir.

2008) ("non-public information remains non-public for purposes of the insider trading laws until

it has been disseminated in a manner sufficient to insure its availability to the investing public or

to insure that the market has had an opportunity to absorb the disclosed information such that the

company's stock price has already adjusted to reflect that information").  Nor is it possible to

determine whether the information merely reflected preliminary or tentative discussions.  *See*

*Carlin Equities Corp. v. Offman*, 2008 WL 4387328, *10 (S.D.N.Y. September 24, 2008)

("information related to the preliminary stages of a potential transaction is more likely to be

immaterial as a matter of law than information related to mature negotiations"); *Taylor v. First*

*Union Corp. of South Carolina*, 857 F.2d 240, 244-45 (4th Cir. 1988) ("the more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision. Information of speculative and tentative discussions is of dubious and marginal significance").

>    2.    Axcan

The government discloses the following as to alleged inside information misappropriated about Axcan: "In or about late October or November 2007, Cutillo and Santarlas told Goldfarb that Ropes & Gray was working on the acquisition of Axcan Pharma, Inc. ("Axcan"). Cutillo and Santarlas periodically updated Goldfarb on the progress of the transaction until it was publicly announced." Exhibit F at 2. Again, the government fails to indicate what material information was conveyed, when precisely this information was imparted, and the contents of the periodic updates allegedly provided. Notably, the government concedes that a trader at Schottenfeld had independently researched Axcan's efforts to secure a buyout and had spoken to representatives of the Company. *Id.* Without the additional particulars, it is impossible to determine if the information was generally public and therefore, by definition, not an appropriate predicate for an insider trading charge. Nor is it possible to determine whether it was material. *See Carlin Equities Corp.*, 2008 WL 4387328 at *10.

>    3.    Kronos

With regard to Kronos the government has provided:

>    In or about March 2007, Gautham Shankar told Zvi Goffer, in
>    substance and in part, that Goffer should purchase Kronos, Inc.
>    ("Kronos") securities. . . . Shankar obtained the information about
>    the Kronos acquisition from Thomas Hardin. Hardin obtained the
>    information from Roomy Khan. Khan obtained the information
>    from Deep Shah. Shah obtained the information from an
>    individual who was working on the transaction either (1) by
>    misappropriating the information from that individual in violation
>    of a duty of trust and confidence between them or (2) by obtaining

> the information from the individual, who violated a duty of trust
> and confidence to the individual's employer and its clients.

Exhibit F at 3. After counsel asked for additional particulars, see E-mail of Michael Sommer

dated May 19, 2010, attached as Exhibit H, the government offered to identify the source of the

Kronos tip after a protective order was in place and stated: "[T]he duty of trust and confidence

between the individual and Shah arose from the fact that that they were roommates."

*See* Letter of AUSAs Andrew Fish and Reed Brodsky, dated May 25, 2010, attached as Exhibit I.

Among the many public indications that Kronos was a likely takeover target were

the public filings indicating that corporate insiders were accumulating large amounts of stock

signaling their obvious confidence in the company's share price. Against this, the Government's

particulars recite only multiple and remote tippees and a "duty of trust and confidence" "owed to

an as yet unnamed "roommate." Indeed, without any specific information concerning the source

of the information, there is no information concerning a breach of a fiduciary duty or duty of

trust. *See Dirks v. SEC*, 463 U.S. 646, 661 (1983) ("In determining whether a tippee is under an

obligation to disclose or abstain [from trading], it is thus necessary to determine whether the

insider's 'tip' constituted a breach of the insider's fiduciary duty").

4.     Hilton

With regard to Hilton the government has provided:

> In or about late June early July 2007, Gautham Shankar told Zvi
> Goffer, in substance and in part, that Goffer should purchase
> Hilton Hotels Corp. ("Hilton") securities and that the company
> could be taken out. . . . Shankar obtained the information about the
> Hilton acquisition from Thomas Hardin. Hardin obtained the
> information from Roomy Khan. Khan obtained the information
> from Deep Shah, who provided it violation of a duty of trust and
> confidence that Shah owed to his employer.

Exhibit F at 3.

The government further provided:

> Shah's employer was Moody's Investors Service, Inc.
> ("Moody's").  Moody's provided ratings for Hilton and had a duty
> to maintain the confidentiality of information provided by Hilton.

Exhibit I at 1-2.

Amid the instant messages, analysts reports, and public rumors indicating a buy-out of Hilton was in the works, such a vague reference to a tip of Gautham Shankar sheds no light on what information was taken from Moody's or tipped down the chain.

5.    Uncharged Stocks

With little comment and almost no discovery, the government has provided a list of other stocks about which they will introduce evidence of "tips" at trial, including PF Chang's China Bistro, Inc., Clear Channel Communications, Inc., ATI Technologies, Inc., Advanced Micro Devices, Alliance Data Systems, Inc., Avaya, Inc., Alexion Pharmaceuticals, Inc., Nu Skin Enterprises, Inc., Allied Waste Industries, Inc., and Cadbury Schweppes Plc, and inVentive Heath, Inc.  *See* Exhibit F at 3-4.  In light of the paltry and vague particulars provided thus far about the alleged insider information at issue in this case, it is critical that the Court grant defendants' requests for the following particulars:

- the actual information communicated;
- the source and intermediate sources of the information;
- the date(s) of communication;
- the alleged duty(ies) breached; and
- the trades made on the information.

Such information is critical not just to ensure adequate preparation for trial, but also to ensure effective drafting of motions to dismiss the Indictment.  *See United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir.1998) (sufficiency of evidence may be addressed on pretrial motion to dismiss Indictment, where "government has made what can fairly be described

as a full proffer of the evidence it intends to present at trial"); Fed.R.Crim.P. 12(b)(2) ("[a]ny

defense, objection, or request which is capable of determination without the trial of the general

issue may be raised before trial by motion").

II.   THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE DOCUMENTS
      RELATING TO COMPLIANCE WITH TITLE III

A.   Introduction

Wiretap surveillance is an "extraordinary investigative device," *United States v.*

*Giordano*, 416 U.S. 505, 527 (1974), subject to "strict guidelines and limitations . . . as a barrier

to Government infringement of individual privacy." *Scott v. United States*, 436 U.S. 128, 143

(1978) (Brennan, J. dissenting).  Among the protections "thought essential by Congress as a

bulwark against unconstitutional governmental intrusion on private conversations," *id.*, are

stringent restrictions on the use and disclosure of the evidence obtained, and specific safeguards

relating to recording, minimizing, and sealing interceptions. *See* 18 U.S.C. §§ 2518(5); 2518(8).

Failure to comply with Title III's strict guidelines may subject the entire fruits of the surveillance

to suppression. *See Giordano*, 416 U.S. at 527.

Here, the government's egregious failure to comply with Title III's mandatory

restrictions and safeguards is evidenced by: (1) the interception and recording of more than

eighty calls on the telephone of an unrelated individual over several months noted only as a

"malfunction" on line sheets; (2) the interception and recording of scores of calls of an intimate

and private nature, including privileged marital communications, in their entirety; (3) the

interception and recording of numerous communications protected by the attorney-client

privilege; (4) the failure to translate intercepted and recorded calls in one or more foreign

languages; and (5) the improper production of the wiretapped recordings contained in the

criminal complaint to the SEC;[3] (6) the fact that the government apparently intercepted and recorded conversations at will; and (7) the absence of statutory authority to use Title III to investigate insider trading. Each of these violations will be the focus of extensive, fact-intensive suppression motions in this case.

Because there is abundant evidence the government has violated the important procedural safeguards of Title III, this Court should order the government to produce all documents related to its attempted compliance with Title III, so that the defendants may move to suppress the wiretap evidence as improperly collected.

B.    The Government's Wiretap Surveillance Violated Title III

It is well-established that "[o]ne of the key goals of Title III is the protection of individual privacy interests from abuse by law enforcement authorities." *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992); *see also Bartnicki v. Vopper*, 532 U.S. 514, 523 (2001) ("One of the stated purposes of [Title III] was 'to protect effectively the privacy of wire and oral communications'"). As Judge John Gleeson noted recently "all one has to do to appreciate the wisdom of Title III's stringent approval requirements is listen to a recording of a wholly innocent conversation that should never have been recorded." *United States v. Simels*, No. 08-CR-640 (JG), 2009 WL 1924746, at *11 (E.D.N.Y. July 2, 2009) (suppressing all fruits of wiretap surveillance because of improper minimization procedures). While private, non-pertinent conversations will inevitably be captured in wiretap surveillance, "it is equally clear that the mandated effort to identify and not intercept such conversations plays 'a central role in the statutory scheme.'" *Id. (quoting Giordano*, 416 U.S. at 528). Thus, "Title III contains a number of provisions designed to tightly control the use of this prosecutorial tool and to

---

[3]    *See* Letter of SEC Senior Trial Counsel Valerie Szczepanick, dated January 27, 2010, at 3-4 n.3, attached as Exhibit J.

safeguard the privacy interests of those subjected to a wiretap." *In re U.S.*, 10 F.3d 931 (2d Cir.

1993).

> For example, an application for a wiretap order must be authorized
> by the Attorney General or her designees, *see* 18 U.S.C. § 2516(1),
> and must be made in writing, under oath, with a statement of the
> applicant's authority. *See* 18 U.S.C. § 2518(1)(a). It must also
> include the identity of the law enforcement officer making the
> application and provide a complete statement of the facts relied
> upon. See 18 U.S.C. §§ 2518(1)(a)-(e). Furthermore, the right to
> intercept is confined to seeking evidence of only certain specified
> serious offenses. See 18 U.S.C. § 2516(1)(a)-( o). In addition, there
> are stringent restrictions on the use and disclosure of the evidence
> obtained. The statute specifies safeguards relating to recording,
> minimizing and sealing the interceptions, as well as notice
> requirements to intercepted parties. 18 U.S.C. § 2518(8)(a), (b),
> (d).

*Id.* at 934.  It is important to note that minimization cannot occur after the fact, except under very

tightly-controlled and limited circumstances, that do not apply in this case.  As Judge Gleeson

explained in *Simels*:

> [T]he way to avoid intercepting privileged or nonpertinent
> communications . . . is take reasonable steps not to intercept them.
> Automatically recording everything, even where that is followed
> by a post-interception minimization protocol, virtually guaranteed
> the interception of communications the government should not
> have seized. The post-interception minimization may have closed
> the barn door, but the horse was already gone.

2009 WL 1924746 at *9.

Violation of Title III subjects the entirety of the fruits of the surveillance to court-

ordered suppression. *See Giordano*, 416 U.S. at 528 ("Congress intended to require suppression

where there is failure to satisfy any of those statutory requirements that directly and substantially

implement the congressional intention to limit the use of intercept procedures to those situations

clearly calling for the employment of this extraordinary investigative device"); *United States v.*

*Gigante*, 538 F.2d 502, 505 (2d Cir. 1976) (holding that Title III's rules regarding the sealing and

storage of recorded communications, 18 U.S.C. § 2518(8)(a), are sufficiently important that a violation of those rules could require suppression); *Simels*, 2009 WL 1924746, at *13 (suppressing fruits of a Title III surveillance because the government failed to minimize the interception of non-pertinent communications between attorneys and their client). As the Second Circuit has observed: "To ignore or gloss over these restrictions, or view them as mere technicalities to be read in such a fashion as to render them nugatory, then, is to place in peril our cherished personal liberties." *United States v. Marion*, 535 F.2d 697, 706 (2d Cir. 1976).

Here, the failures to comply with Title III were numerous and egregious as defendants intend to document in a motion to suppress.

C.    The Court Should Order the Production of Documents Relating to the Government's Compliance with Title III

In light of the abundant evidence that the government failed to comply with Title III's procedures, the Court should order the government to produce all documents relating to the investigating agents' efforts to comply with any monitoring and minimization protocol, and the prosecutors' efforts to supervise such compliance. At a minimum, the following documents should be produced to the defendants:

- all documents signed by monitoring agents or translators indicating they have read the instructions pertaining to minimization and the permissible scope of monitoring;

- the names of all FBI special agents, FBI employees, and FBI translators who had access to the contents of the wiretaps, their position within the FBI, the authority for their access to the wiretapped conversations within the scope of Title III, and the orders of authorization;

- all documents evidencing communications about, receipt and acknowledgement of, and efforts to comply with, the minimization protocol contained in the various orders authorizing wiretaps in this case, including any "sign in sheet" upon entering the monitoring room acknowledging their receipt of and compliance with minimization protocols;

- all reports, memoranda and notes made by investigating agents about the monitoring of the phone numbers at issue in the various wiretap orders;

- all reports, memoranda and notes made by investigating agents about their surveillance of the defendants in this case; and

- all instant messages, text messages, and email messages, made by the agents conducting electronic or physical surveillance of the defendants in this case, to the extent that they refer to the defendants or surveillance operations.[4]

In addition, defendants seek analyses of trading data reference in successive wiretap applications and progress reports.

These documents are necessary so that the defense may evaluate the objective reasonableness of the agents' and prosecutors' efforts to comply with Title III and draft focused and tailored suppression motions. *See Simels*, 2009 WL 1924746, at *7-9 (analyzing the objective reasonableness of the government's minimization protocol); *Giordano*, 416 U.S. at 528 (suppression of improperly obtained wiretaps is remedy for violation).

III.   THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE BRADY & GIGLIO NECESSARY FOR SUPPRESSION MOTIONS

In addition to filing motions to suppress the wiretaps at issue in this case based on the shockingly noncompliant conduct of the wiretaps, defendants intend to seek to suppress the fruits of the wiretap surveillance under *Franks v. Delaware*, 438 U.S. 154 (1978) (suppression appropriate where sworn affidavit of government agent contains "deliberately or recklessly false statement[s]"); *see also* 18 U.S.C. §§ 2518(10)(b), (d) (Title III requires that the government provide "a full and complete statement of the facts and circumstances" establishing probable cause and a "full and complete statement" of the other "investigative procedures [that] have been tried"). These false or reckless statements include misrepresentations concerning cooperators

---

[4]   These documents were requested in an E-mail from JaneAnne Murray to AUSAs Fish and Brodsky dated May 26, 2010, attached hereto as Exhibit K.

Roomy Khan and David Slaine. The government should be directed to disclose *Giglio* material as to these two cooperating witnesses for use in the suppression motions.

As Judge Holwell noted in his Memorandum and Order, dated April 22, 2010, the question of whether *Brady* and *Giglio* apply to pretrial suppression hearings is "an open question in this circuit." *See* Memorandum and Order, attached as Exhibit L at 3 n.2 (quoting *United States v. Nelson*, 193 Fed.Appx. 47, 53 (2d Cir 2006). The Ninth Circuit has held that such *Brady* disclosures must be made in connection with "suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant." *United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993). The Fifth Circuit has reached the same conclusion. *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), vacated on other grounds, 503 U.S. 930 (1992). Judge Holwell goes on to note that other circuits have avoided the issue. *See* Memorandum and Order, attached as Exhibit L at 3 n.2 (collecting cases).

Here the issue is presented starkly. It is clear that extensive *Giglio* exists as to the two cooperating witnesses. For example, the November 15, 2007 Title III application for Drimal's telephone only makes a passing reference to Slaine's involvement in the sprawling UBS Securities case, with no detail of the scope of his involvement, the degree of losses incurred or his role in orchestrating that scheme. *See* Exhibit B at ¶ 15. No criminal history or details of Slaine's criminal conduct have been produced to defense counsel and the government has indicated it will not provide this information in advance of filing motions to suppress. *See* Letter of AUSAs Andrew Fish and Reed Brodsky, dated May 19, 2010, attached as Exhibit M. In addition, the government has refused to turn over details (including proffer notes and interview reports) of other alleged securities violations Slaine has engaged, referring counsel to FINRA's website. *See id.*

Similarly, we understand there is extensive *Giglio* as to Roomy Khan, since it has already been turned over in *United States v. Rajaratnam* and is referenced in filings before Judge Holwell and on www.rajdefense.org This *Giglio* is relevant to a *Franks* motion attacking the fruits of the Shankar and Hardin wiretaps. For example, in connection with the June 10, 2008 application to intercept telephone calls over Thomas Hardin's telephone, cooperator Roomy Khan is referenced as a CS who "knows THOMAS HARDIN, and has communicated with HARDIN in the past. But who does not know HARDIN's sources of information." *See* Affidavit in Support of Application for Authorization to Intercept Wire Communications, dated June 10, 2008, at ¶ 41, attached as Exhibit N. In fact, Ms. Khan was the source of the tips on Hilton and Kronos. Litigation in the *Rajaratnam* case has revealed, in the words of Judge Holwell, Roomy Khan "provided inconsistent information to the government." *See* Exhibit L at 3. The government refused production indicating that because Ms. Khan was only referenced in an "alternative investigative means" portion of the affidavit, disclosure of proffer notes and *Giglio* relating to her was not required. *See* Letter of Reed Brodsky and Andrew Fish, dated May 6, 2010, attached as Exhibit O. However, either Ms. Khan had lied to the government about being the source of tips on Hilton and Kronos, or the government concealed her role and criminal conduct from the authorizing judge. In either case, the information is necessary to suppression motions on the Shankar and Hardin wiretaps, and their fruits.

IV.     THE GOVERNMENT SHOULD BE ORDERED TO PROVIDE ADDITIONAL RULE 16 DISCOVERY TO ASSIST IN PREPARING MOTIONS AND FOR TRIAL

A.     Introduction

In addition to the materials requested above for use in preparing motions to suppress, the defendants further seek an order of the Court requiring the disclosure of additional Rule 16 material so that the defendants have adequate time to review and analyze the evidence

prior to trial. On December 15, 2009, the government began producing Rule 16 discovery on a rolling basis and without the benefit of an inventory. Among the twenty-four CD's produced to date are a limited number of selected consensual recordings made by cooperating witnesses and selected wiretap recordings, line sheets, court-issued interception orders, and certain related documents. The government, however, has refused to provide other consensual recordings by the same cooperating witnesses or the approximately 18,000 wiretap recordings made during its criminal investigation (the "Requested Materials"),[5] despite defendants' repeated request for production of this material evidence. The government's position violates its obligations under Rule 16, *Brady* and *Giglio*, and the Court should order the immediately disclosure of these materials to the defendants.

B.      The Requested Materials Should be Disclosed Pursuant to Rule 16

Rule 16 is designed to ensure the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; facilitating the defendant's ability to raise objections to admissibility prior trial, minimizing the undesirable effect of surprise at trial; and contributing to an accurate determination of guilt or innocence. *See* Fed. R. Crim. P. 16 Advisory Committee's note to 1974 amendment. In furtherance of those objectives, Rule 16 requires the government to produce documents and objects within its possession, custody or control if the information is material to the preparation of the defense or if the government intends to use the information in its case in chief at trial. Fed. R. Crim. P. 16(a)(1)(E); *see also, United States v. Stevens*, 985 F.2d 1175, 1179 (2d Cir. 1993).

---

[5]      The Requested Materials are described with particularity in part IV.B, *supra.*

"The 'materiality standard [of Rule 16] normally is not a heavy burden; rather, evidence is material so long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *United States v. Stein*, 488 F. Supp. 2d 350, 356-57 (S.D.N.Y. 2007) (*quoting United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)); *see also United States v. Bergonzi*, 216 F.R.D. 487, 501 (N.D. Cal. 2003) ("The materiality requirement . . . is not a heavy burden . . ." (internal quotation marks omitted). Indeed, "[a] narrow view of Rule 16 . . . is inappropriate; failure to provide reasonably available material that might be helpful to the defense and which does not pose any risks to witness or to [an] ongoing investigation is contrary to the requirement of due process and to the purposes of the Confrontation Clause." *United States v. Zanfordino*, 833 F. Supp 429, 432 (S.D.N.Y. 1993). Instead, "[t]he language and spirit of [Rule 16] are designed to provide a criminal defendant, in the interest in fairness, the widest possible opportunity to inspect and receive [discoverable] materials . . . ." *See United States v. Poindexter*, 727 F.Supp. 1470, 1473 (D.D.C. 1989).

Under Rule 16, this Court has broad authority to regulate discovery beyond the authority expressly provided by other Rules. *See* Fed. R. Crim. P. 16(d)(1) ("At any time the court may, for good cause . . . grant other appropriate [discovery] relief."); *United States v. Fletcher*, 74 F.3d 49, 54 (4th Cir. 1996) ("Pursuant to Rule 16, the court has authority to regulate discovery, which includes the power to make such . . . order[s] as is appropriate."); *United States v. Delia*, 944 F.2d 1010, 1018 (2d Cir. 1991) (same). That is, Rule 16 is "intended to prescribe the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." Fed. R. Crim. P. 16 Advisory Committee's note to 1974 amendment. Indeed, the Second Circuit has recognized that

a district court has "inherent authority to regulate the nature and timing of discovery." *See United States v. Giffen*, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004) (*citing United States v. Cannone*, 528 F.2d 296, 298 (2d Cir. 1975)).

     C.    The Requested Materials

          1.    Outstanding Consensual Recordings

While the government has produced approximately 168 consensual recordings, the government concedes that it has intentionally withheld "approximately 23 unproduced Slaine recordings . . . [and] [t]here are unproduced recordings of one or more other CWs." *See* E-mail of AUSA Andrew Fish dated May 26, 2010 attached as Exhibit P. The government has offered no explanation for its refusal to disclose these recordings other than to say they "have nothing to do with this case." *Id.*

Rule 16 requires that the government disclose these materials. As noted above, the government is required to produce *all* "documents and objects within its possession, custody or control if the information is material to the preparation of the defense . . .." Fed. R. Crim. P. 16(a)(1)(E) (emphasis added); *Stevens*, 985 F.2d at 1180 ("Evidence that the government does not intend to use in its case in chief is material if it could be used to counter the government's case or bolster a defense.") Given the low threshold for demonstrating materiality in this context, it is undeniable that these tapes would assist in the preparation of the defense. These recordings were made by the cooperating witnesses whose testimony will be the centerpiece of the government's case. Certainly, other efforts made by these cooperating witnesses to curry favor with the same agents and prosecutors involved in this case would be information that is "material to the preparation of the defense."[6]

---

[6]    It is unclear what, if any, effort has been made by the Government to identify *Brady* and/or *Giglio* material contained within these tape recordings.

2.     The "Galleon Wiretap"

As the Court is aware, the government made significant use of Title III wiretaps during the investigation giving rise to the instant charges. To date, the government has produced the intercepted telephone calls of defendants Craig Drimal, Jason Goldfarb and Zvi Goffer and cooperating witnesses Thomas Hardin and Gautham Shankar. Despite repeated requests, however, the government has inexplicably refused to disclose all but four calls intercepted from Raj Rajaratnam's cellular telephone ("the Galleon Wiretap"). Nevertheless, the Drimal, Goffer, and Goldfarb wires were produced to defendants in the Rajaratnam case for their use in preparing their defense – an obvious indicia of materiality.[7]

As noted above, the defendants are charged with engaging in an insider trading conspiracy spanning a two-year period from 2007 through 2008. During this very time period, defendant Zvi Goffer worked at Galleon for Rajaratnam. Zvi Goffer was named a "target subject" on the application to intercept Rajaratnam's calls and was intercepted on Rajaratnam's phone discussing some of the very stocks that the government has identified as the subject matter

---

[7]     These wires are now the subject of efforts of the government to compel their disclosure from civil defendants including Raj Rajaratnam. Danielle Chiesi, Zvi Goffer and David Plate to the SEC and other civil parties. In support of that effort AUSA Jonathan Streeter wrote in a January 20, 2010 letter to Judge Rakoff in *SEC v. Galleon Management, LP, et al.*, 09 Civ. 8811 (JSR):

> Certain parties to this lawsuit have the wiretap evidence because the Government produced it to them either in pre- or post-Indictment discovery in the parallel criminal cases. As far as the Government is aware, no-one disputes that that evidence is either is either highly relevant or, at a minimum, may lead to relevant evidence in this civil SEC action. The Government submits that Title III does not prohibit the defendants from making that disclosure, and therefore the material should be produced in discovery. (Footnote omitted). The Government further submits that to the extent the defendants are withholding the evidence based on the privacy interests of those intercepted (including themselves), those privacy interests can be protected with a protective order enforced by this Court.

Attached as Exhibit Q.

of the indicted conspiracy in its April 27, 2010 letter. Indeed, in *United States v. Rajaratnam*,

the government has alleged that Zvi Goffer provided Rajaratnam with material, non-public

information concerning two stocks PF Chang's China Bistro, Inc. (PFCB) ("PF Chang's") and

Clear Channel Communications (CCU) ("Clear Channel").[8] *See* Letters of AUSAs Jonathan

Streeter and Reed Brodsky, with attachment, dated April 14, 2010, attached as Exhibit R. The

Rajaratnam wire undoubtedly captures Rajaratnam discussing these very stocks with others.

Certainly, if the Court permits these stocks to be included in the government's case, the

Rajaratnam wire could provide crucial evidence concerning whether Rajaratnam relied on any

information purportedly conveyed to him by Zvi Goffer, whether he viewed it as credible,

material or public. Indeed, the fact that trading by Zvi Goffer and other Galleon traders in Clear

Channel and PF Chang's reportedly lost many millions of dollars would suggest both that any

alleged inside information tipped to Rajaratnam was far from material. Discovery of

communications over Rajaratnam's telephone on these notable losses would of course be

material to Mr. Goffer's defense. Simply put, there is no legitimate reason to withhold the

Rajaratnam wire from the defendants named in this Indictment.

## V.    THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE MATERIALS IN THE POSSESSION OF THE SEC

The Court should further order the government to produce all materials

discoverable under Rule 16, *Brady*, and *Giglio* possessed by the SEC. The government is

obligated to provide exculpatory and impeachment material in the possession, custody, and

---

[8]    Despite the close connection between Zvi Goffer and the Galleon investigation, no trading data, Galleon research reports, e-mails, or instant messages have been turned over by the government supporting these allegations. The government has asked counsel to negotiate a protective order directly with Galleon after which some discovery from Galleon described only as "IMs, emails, and trading records" and which are now being held by the government will be produced. Without knowing the scope of the material to be produced, we cannot represent that we will be receiving all Galleon communications relevant to defending charges that Zvi Goffer committed insider trading in these stocks.

control of the SEC. *See, e.g., SEC v. Saad*, 229 F.R.D. 90, 92 (S.D.N.Y. 2005) (when SEC and

USAO conducted parallel investigations, materials in the possession of the SEC may "well be

'*Brady*' material that the government might well be required to turn over sufficiently before trial

to enable the defense to make meaningful use of them"); *see also United States v. Wood*, 57 F.3d

733, 737 (9th Cir. 1995) ("The Government . . . cannot tell the court that there is nothing more to

disclose while the agency interested in the prosecution holds in its files information favorable to

the defendant." ); *United States v. Jennings*, 960 F.2d 1488, 1490 (9th Cir. 1992) (noting that

*Brady* requirements "cannot be evaded by claiming lack of control over the files or procedures of

other executive branch agencies"); *United States v. Hankins*, 872 F. Supp. 170, 173 (D.N.J.

1995) ("when the Government is pursuing both a civil and criminal prosecution against a

defendant stemming from the same underlying activity, the Government must search both the

civil and criminal files in search of exculpatory material").

  This case was jointly investigated by the SEC and Department of Justice with

criminal and civil charges ceremoniously and simultaneously announced on November 5, 2009.[9]

The very language in *SEC v. Cutillo* indicates that before the complaint was filed the SEC had

access to government cooperators and recorded telephone calls. A particularly egregious

example of the SECs selective use of such information is its references to Zvi Goffer as having

---

[9] The press release issued by the USAO stated: "Mr. BHARARA praised the work of the FBI and thanked the United States Securities and Exchange Commission for its assistance in the investigation." *See* Press Release dated November 5, 2009, attached at Exhibit S. The SEC's Director of Enforcement Robert Khuzami similarly stated: "Today's actions against these wrongdoers are the result of continued exemplary cooperation between the SEC, the U.S. Attorney's Office in New York, and the FBI." *See* Speech by SEC Staff: Remarks at November 5, 2009 Press Conference by Robert Khuzami attached at Exhibit T. The SEC's November 5, 2009 press release on the matter discloses the joint nature of the investigation and relationship with the Government: "The SEC thanks the U.S. Attorney's Office and the Federal Bureau of Investigation for their cooperation and assistance in connection with this matter." *See* "SEC Charges Wall Street Lawyers and Traders in $20 Million Insider Trading Scheme," attached at Exhibit U.

the code name of "Octopussy" who chewed a SIM card to destroy evidence of a telephone call

tipping him on inside information. *See SEC v. Cutillo* Complaint attached at ¶¶ 2, 20, attached as

Exhibit V. Mr. Khatami made much of the alleged "code name" at his press conference stating:

> Certain moral truths should be self-evident. And there should be a moment
> - hopefully before you're holding a bag of cash delivered to you by
> somebody code-named "the Octopussy" - that causes anyone in a position
> to tip or trade inside information to think twice before taking such a
> misguided step.
>
> And if you find yourself chewing the memory card in your cell phone to
> destroy any record of your misconduct, something has gone terribly wrong
> with your character.

*See* Exhibit T. Those sensational and unfounded allegations have been reported widely and often

in the financial press, notably by the *Wall Street Journal*. No tales of SIM card destruction have

been produced by the government in discovery and a search of hundreds of thousands of instant

messages and thousands of recorded telephone calls has yielded only one reference to the James

Bond movie reference being applied to Zvi Goffer, namely as a joking reference in a single

recorded call between Slaine and Drimal on September 26, 2007. Thus the SEC's own filings

indicate it was making charges based on information from the government's cooperating

witnesses and from recorded conversations.

The government, which has publicly acknowledged working with the SEC on this

investigation, must be ordered to produce all Rule 16, *Brady* and *Giglio* material in the

possession of the SEC because a "prosecutor will be deemed to have knowledge of and access to

anything in the possession, custody or control of any federal agency participating in the same

investigation of the defendant." *United States v. Upton*, 856 F. Supp. 727, 750 (E.D.N.Y. 1994)

(*quoting United States v. Bryan,* 868 F.2d 1032, 1036 (9th Cir. 1989)); *accord United States v.*

*Jackson*, 850 F. Supp. 1481, 1503 (D. Kan. 1994); *United States v. Scruggs*, 583 F.2d 238, 242

(5th Cir. 1978) (recognizing that the government's obligation to produce documents extends to documents in the possession of the FBI).

Even if there were not a joint investigation, the prosecutors are certainly aware of the SEC's separate cases now. "An individual prosecutor is presumed, however, to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable [*Brady* and *Giglio*] evidence known to the others acting on the government's behalf in the case. . . .'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (*quoting Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

The obligation extends to Rule 16 materials as well. *See Upton*, 856 F. Supp. at 749-50 ("Rule 16 . . . requires . . . the production of documents in the hands of the prosecutor, any investigative unit under the prosecutor's control, and any other federal agency allied with the prosecution or involved in the prosecution of criminal litigation.") (*quoting United States v. Poindexter*, 727 F. Supp. 1470, 1477 (D.D.C. 1989)); *United States v. NYNEX Corp.*, 781 F. Supp. 19, 25 (D.D.C. 1991) (mem.) (holding that prosecution must produce materials possessed by other federal agencies allied with prosecution). The prosecutor cannot "avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial." *United States v. Giffen*, 379 F.Supp.2d 337, 342 (S.D.N.Y. 2004) (quotations omitted).

Despite the indisputable legal and factual basis for producing materials in the possession of the SEC to the defense, the government has steadfastly refused to do so. The government has stated its position as follows:

> As we stated in our earlier correspondence, materials in the possession of the Securities and Exchange Commission are not in our control, and we will not produce them.

Exhibit M.  Given the close cooperation throughout the investigation and charging of this case by the USAO and the SEC, and the legal authority rejecting the government's position, the government's attempt to shield materials in the possession of the SEC from production to the defendants should be rejected.

The defendants therefore respectfully request that this Court order the USAO to produce all Rule 16, *Brady* and *Giglio* material in the possession, custody or control of the SEC.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court direct the

government to provide the requested particulars and discovery.

Respectfully Submitted.


Date:   New York, New York
        May 27, 2010


_/s/ Cynthia Monaco_
CYNTHIA M. MONACO
Anderson Kill & Olick, P.C.
Attorneys For Zvi Goffer
1251 Avenue of the Americas
New York, New York  10020
Tel.  (212) 278-1000

/s/

JEFFREY C. HOFFMAN
Hoffman & Pollok LLP
Attorneys For Jason Goldfarb
260 Madison Avenue, 22nd Floor
New York, New York 10016
Tel.  (212) 679-2900

/s/

MICHAEL S. ROSS
Law Offices Of Michael S. Ross
Attorneys For Emanuel Goffer
60 East 42nd Street
Forty-Seventh Floor
New York, New York  10165
Tel.  (212) 505-5200


/s/

ROLAND RIOPELLE
DIANE FERRONE
Sercarz & Riopelle, L.L.P.
Attorneys For David Plate
152 West 57th Street, 24th Floor
New York, New York  10019
Tel.  (212) 586-4900


/s/

CATHERIN L. REDLICH
Driscoll & Redlich
Attorneys For Arthur Cutillo
521 Fifth Avenue, Suite 3300
New York, New York  10175
Tel.  (212) 986-4030

_/s/ Jane Anne Murray_
JANEANNE MURRAY
Law Offices Of Jane Anne Murray
Attorneys For Craig Drimal
233 Broadway
New York, New York 11215
Tel.  (212) 941-9266

/s/

MICHAEL SOMMER
MORRIS J. FODEMAN
Wilson, Sonsini, Goodrich & Rosati, PC
Attorneys For Michael Kimelman
1301 Avenue of The Americas
Fortieth Floor
New York, New York  10019
Tel.  (212) 447-7704