UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
:
UNITED STATES OF AMERICA,                           :
:
  - v. -                                            :        S1 10 Cr. 56 (RJS)
:
ZVI GOFFER,                                         :
:
              Defendant.                            :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S SENTENCING MEMORANDUM


                                            PREET BHARARA
                                            United States Attorney for the Southern
                                            District of New York

ANDREW L. FISH
REED M. BRODSKY
RICHARD C. TARLOWE
Assistant United States Attorneys

        - Of Counsel -

**Table of Contents**

I.    Goffer's Criminal Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.    The Corruption of the Ropes & Gray Attorneys. . . . . . . . . . . . . . . . . . . . . . . . . . 1

     B.    Goffer Pays for the Shankar Tips.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

II.   Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.    The Guidelines Sentencing Range.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.    A Sentence Within the Guidelines Range Is Appropriate. . . . . . . . . . . . . . . . . . . 7

IV.   The Court Should Order Forfeiture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

The Government respectfully submits this memorandum in connection with the sentencing of Zvi Goffer. As the evidence at trial established, Goffer was the leader of an insider trading ring that bribed lawyers to obtain valuable inside information regarding corporate mergers and acquisitions. Goffer and his co-conspirators used this inside information to earn millions of dollars in illegal trading profits.

Goffer organized and operated the insider trading ring. He sought out corruptible lawyers who would disclose confidential information from their law firm in exchange for cash bribes. He collected cash from co-conspirators to help fund the bribe payments. He personally delivered to Jason Goldfarb $97,500 in cash bribes. Goffer also distributed numerous prepaid cellular telephones to his co-conspirators in an effort to evade detection by law enforcement.

Goffer and his co-conspirators earned over $10 million in illegal profits by trading on inside information misappropriated by two Ropes & Gray attorneys. In addition, Goffer used his access to inside information to obtain a job at the Galleon Group, where he traded significantly more capital. Goffer believed that his position at Galleon would allow him to earn even more money trading on inside information. Indeed, Goffer told Goldfarb that, while Goffer was trading stocks at Galleon, the bribes for profitable tips could be as much as $500,000. (GX 121-T at 6).

Goffer's criminal scheme was brazen, sophisticated and extensive. Accordingly, a substantial sentence is necessary to adequately punish Goffer for his crimes and to deter others from wrongdoing. For the reasons that follow, Goffer should receive a sentence within the Sentencing Guidelines range of 121 to 151 months' imprisonment.

I. **Goffer's Criminal Conduct**

    A. **The Corruption of the Ropes & Gray Attorneys**

    The trial evidence and guilty plea allocutions in this case establish that, while working as

a proprietary trader, Goffer asked Jason Goldfarb if he knew any attorneys who had access to material, nonpublic information regarding corporate acquisitions. Goffer told Goldfarb that Goffer would pay cash for such inside information. Goldfarb then approached Arthur Cutillo (a Ropes & Gray associate) and asked him to participate in this insider trading scheme. Eventually, in the summer of 2007, Cutillo and Brien Santarlas (another Ropes & Gray associate) agreed to participate in Goffer's scheme. Cutillo and Santarlas provided to Goldfarb privileged and confidential information regarding potential mergers and acquisitions involving Ropes & Gray clients. Goldfarb then passed the information to Goffer.

Goffer provided Goldfarb with multiple sets of prepaid cellular telephones for Goldfarb, Cutillo and Santarlas to use to communicate with each other about inside information. Goffer also provided Goldfarb and other co-conspirators with prepaid cellular telephones to use when communicating with Goffer regarding inside information. These prepaid cellular telephones could not be linked to the conspirators, and Goffer employed them in an effort to avoid detection by law enforcement.

Cutillo and Santarlas provided Goffer (via Goldfarb) with, among other things, inside information regarding the acquisitions of 3Com Corporation ("3Com") and Axcan Pharma, Inc. ("Axcan"). Cutillo and Santarlas also provided Goffer with information regarding the closing of the acquisition of Clear Channel Communications, Inc. Following the announcement of the 3Com acquisition, Goffer delivered to Goldfarb $75,000 to be split among Goldfarb, Cutillo, and Santarlas. Following the announcement of the Axcan acquisition, Goffer delivered to Goldfarb $22,500 to be split among Goldfarb, Cutillo and Santarlas.

Goffer personally traded on the 3Com information while employed at the Schottenfeld

Group, and he personally traded on the Clear Channel information at Galleon. In addition, Goffer provided the tips, including the information about the 3Com and Axcan acquisitions, to other conspirators, including Craig Drimal. Goffer asked Drimal to share the inside information with others at Galleon in an ultimately successful effort to get a job at Galleon. Goffer also used his access to inside information as a means to recruit traders to Incremental Capital.

### B.   Goffer Pays for the Shankar Tips

In addition to corrupting the Ropes & Gray attorneys, Goffer also profited by executing securities transactions in advance of the public announcement of (1) the acquisition of Kronos, Inc., by Hellman & Friedman Capital Partners VI, L.P., and its related funds, and (2) the acquisition of Hilton Hotels Corp. by The Blackstone Group. Goffer received tips to buy these securities from Gautham Shankar, who worked with Goffer at Schottenfeld.

The information regarding the Hilton and Kronos transactions came from Deep Shah, an employee of Moody's. In the case of Hilton, Shah learned about the transaction in the course of his employment at Moody's and had a duty not to disclose the information. In the case of Kronos, Shah obtained information about the transaction from a roommate, who learned about the transaction through his employment at an investment bank. Shah either misappropriated the Kronos information from the roommate or obtained the information from the roommate, who provided it to Shah in violation of a duty of trust and confidence to the investment bank and its clients. Shah passed the information about these transactions to Roomy Khan. Khan passed the information to Thomas Hardin, and Hardin passed the information to Shankar.

Shankar did not tell Goffer the source of the Kronos and Hilton tips. However, following the Kronos and Hilton acquisitions, Shankar asked Goffer for cash to pay his source. Goffer paid

Shankar approximately $10,000 after the Kronos acquisition and additional cash after the Hilton acquisition.

### II.     Applicable Law

Although the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). Indeed, the applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).

In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims" *United States* v. *Booker*, 543 U.S. at 260 (citations omitted); *see also id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

Apart from the Sentencing Guidelines, as the Court is well aware, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a

sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Section 3553(a) further directs the Court—in determining the particular sentence to impose—to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a). The Court "shall impose a sentence sufficient, but not greater than necessary, to comply" with these purposes. *Id*.

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See United States* v. *Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the

Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113.

## III. Analysis

For the reasons discussed below, Goffer's Guidelines sentencing range is 121 to 151 months' imprisonment. Goffer's illegal conduct, weighed in view of the factors set forth in Section 3553(a), warrants a term of imprisonment within the Guidelines range.

### A. The Guidelines Sentencing Range

Goffer's assertion that the foreseeable gain resulting from the offense is less than $7 million is without merit. The gains resulting from the Ropes & Gray tips alone were well more than $7 million. Therefore, the Probation Department's Guidelines offense level calculation is correct.

The conspirators' gains resulting from the Ropes & Gray tips were as follows:

| | | |
|---|---|---|
| Zvi Goffer: | 3Com: | $378,608 (Schottenfeld account) |
| | Clear Channel: | $1,002,323 (May 2008) (Galleon acct.)[1] |
| Emanuel Goffer: | 3Com: | $723,523 |
| | Clear Channel: | $38,100 (May 2008) |
| Michael Kimelman: | 3Com: | $16,687 (personal account) |
| | | $243,716 (Lighthouse trading account) |
| | Clear Channel: | $28,676 (May 2008) |

---

[1]Goffer and other conspirators lost money in March 2008 by executing trades based on the incorrect tip from the Ropes & Gray attorneys that the Clear Channel transaction would be closing at that time. In May 2008, the Ropes & Gray attorneys tipped Goffer (via Goldfarb) that the litigation between Clear Channel and certain other parties would be settled. Goffer and his co-conspirators profited by trading on this material, nonpublic information.

| | | |
|---|---|---|
| David Plate: | Axcan: | $227,900 (Schottenfeld account)<br>$46,779 (Jodi Plate account)[2] |
| Craig Drimal: | 3Com: | $4,312,032 |
| | Axcan: | $1,974,422 |
| Michael Cardillo: | 3Com/Axcan: | $731,505 |
| Gautham Shankar: | 3Com: | $212,541 |
| Franz Tudor: | Axcan: | $86,119 |

The profits from the Ropes & Gray tips totaled $10,022,931. Thus, even if profits from the Kronos and Hilton trades were excluded from the Guidelines analysis, the foreseeable gains resulting from the offense would still be well in excess of $7 million (the threshold for a 20-level increase pursuant to U.S.S.G. §§ 2B1.1(b)(1)(K)).

**B.    A Sentence Within the Guidelines Range Is Appropriate**

Goffer's organization and leadership of an insider trading ring that corrupted lawyers and reaped over $10 million in illegal profits warrants a sentence within the Guidelines range. In arguing for a lower sentence, Goffer claims that he suddenly changed in late 2008 and is a "more mature man" now. This claim should be rejected.

Goffer's insider trading scheme ended for two principal reasons: (1) Santarlas was laid off from Ropes & Gray in mid-2008, so Goffer lost one of his inside sources; and (2) the financial crisis significantly reduced (if not eliminated) the number of corporate acquisitions on

---

[2] Plate earned $435,290 through 3Com trades in his Schottenfeld account and $63,244 throught 3Com trades in the Jodi Plate account. Plate testified that one of the reasons for his 3Com trades was Zvi Goffer's tip. (Tr. 812-13). Zvi Goffer's Guidelines range is the same whether or not Plate's 3Com profits are included.

which Goffer could profitably trade. The notion that Goffer decided that there would be no insider trading at Incremental Capital is belied by the trial evidence. Indeed, as late as August 2008, Goffer sought to recruit David Slaine to Incremental Capital by promising Slaine access to valuable information. (GX 222-T at 13-14). During this meeting, Goffer told Slaine that he would not divulge the source of his information to protect them in the event of a Government investigation. (*Id.* at 13). Similarly, Goffer's suggestion that he turned from his criminal ways because of the birth of his children is not credible.[3]

Goffer's assertion that his "swagger" at the time of his criminal offenses has been replaced with an "honest humility" is belied by, among other things, his conduct over a long period of time during his criminal scheme and the timing of his new claim. For more than one year, Goffer spent a significant amount of his time attempting to corrupt insiders to obtain illegal tips, corrupting two attorneys at Ropes & Gray to obtain inside information, and recruiting others, including his brother, into his scheme. During that period of time, Goffer was fully engaged in criminal activities on an almost daily basis—activities that are completely inconsistent with honesty and humility. Moreover, the recordings introduced into evidence at trial make plain that Goffer had no discomfort or hesitation about committing such an elaborate, brazen and egregious crime; to the contrary, he was eager and enthusiastic about the criminal conduct and even sought to increase its scale and scope. Further, Goffer's claim of a newfound humility rings hollow, as it followed his conviction by a jury and resulting exposure to a substantial term of imprisonment.

---

[3] Contrary to Goffer's claim in his sentencing memorandum, he engaged in insider trading following the birth of his first child.

Several factors call for a significant sentence in this case. First, Goffer's criminal conduct was extensive. Goffer recruited lawyers and paid them bribes to breach their duties to their law firm and the law firm's clients. Goffer took (and encouraged his co-conspirators to take) extensive steps to avoid detection, including (1) using an intermediary (Jason Goldfarb) to communicate with the Ropes & Gray attorneys, (2) distributing and using anonymous prepaid cellular telephones to communicate about inside information, (3) purchasing put options and multiple stocks across a sector, and (4) creating false paper trails to hide the true motivations behind his and his co-conspirators' stock purchases. Goffer's criminal conduct extended over a period of more than one year and generated over $10 million in illegal profits. Goffer's actions caused substantial harm to the capital markets and to Ropes & Gray, its clients, and the public companies whose information was stolen. Goffer knew he was breaking the law, but sought to enrich himself in the apparent belief that he would not be caught.

Second, the need for both specific and general deterrence warrants a significant sentence. Goffer's was willing to go to great lengths to enrich himself, and a significant term of imprisonment is appropriate to deter him from future misconduct. In addition, insider trading is difficult to detect and prosecute. As a result, when law enforcement uncovers an insider trading scheme, it is important to send a clear and powerful message that those committing this offense will be prosecuted and go to prison for a significant length of time. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

9

Third, the need to avoid unwarranted sentencing disparities requires a substantial sentence in this case. Goffer includes with his sentencing submissions a list of various sentences in insider trading cases in this district. This list is of little value — it includes both cooperating and non-cooperating defendants, both defendants who pleaded guilty and defendant who were convicted after trial, and defendants who engaged in a widely varying conduct. However, Goffer is more culpable than Craig Drimal, whom this Court sentenced to 66 months' imprisonment. Moreover, Drimal, unlike Goffer, accepted responsibility for his crimes by pleading guilty before trial. Accordingly, Goffer should receive a sentence of substantially more than 66 months' imprisonment.

## IV.     The Court Should Order Forfeiture

The Government may obtain a money judgment against the defendant to recover the amount of the crime proceeds. *See*, *e.g.*, *United States* v. *Kalish*, 626 F.3d 165, 169 (2d Cir. 2010); *United States* v. *Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (a forfeiture order may include a money judgment for the amount of money involved in an offense; the money judgment acts as a lien against the defendant personally for the duration of his prison term and beyond); Fed. R. Crim. P. 32.2. The amount of the money judgment should be equal to the gross proceeds of the defendant's crime, without deducting expenses. *See*, *e.g.*, *United States* v. *Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (defendant convicted of food stamp fraud was properly sentenced to a forfeiture money judgment equal to the entire loss amount paid by the government, without subtracting the amount of cash that the defendant shared with the food stamp beneficiary; "Because the statute [18 U.S.C. § 981(a)(2)(A)] directs that 'proceeds' are not limited to net profits from the crime, and because any proceeds directly traceable to food stamp fraud are

subject to forfeiture, the district court did not commit error by entering a forfeiture order equal to the entire loss amount."). A money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment. *See*, *e.g.*, *United States* v. *Kalish*, 626 F.3d at 169. In cases involving continuing schemes and conspiracies, the amount involved in the entire scheme is forfeitable. *See*, *e.g.*, *United States* v. *Royer*, 549 F.3d 886, 904 (2d Cir. 2008) (holding that defendant in insider trading case was properly ordered to forfeit all profits earned by defendant's tippees).

Accordingly, Goffer should be ordered to forfeit the gain from the offenses that was reasonably foreseeable to him. If this Court were to exclude Hilton proceeds and Plate's 3Com proceeds, that figure would be $10,022,931 in United States currency.[4]

---

[4] Plate's 3Com proceeds were $498,534. The conspirators' Hilton proceeds were as follows: Zvi Goffer's proceeds were $354,612; Emanuel Goffer's proceeds were $1,671,129; Craig Drimal's proceeds were $4,292,653; Michael Kimelman's proceeds were $213,316.

**CONCLUSION**

For the reasons explained above, Zvi Goffer should be sentenced to a term of imprisonment within the Guidelines range of 121 to 151 months' imprisonment.

Dated: New York, New York
September 14, 2011

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____/s/_____
Andrew L. Fish
Reed M. Brodsky
Richard C. Tarlowe
Assistant United States Attorneys
(212) 637-2598/2492/2330