# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Nos. 10-cr-56-1 (RJS),
10-cr-56-2 (RJS)

UNITED STATES OF AMERICA

VERSUS

ZVI GOFFER AND MICHAEL KIMELMAN,

Defendants.

OPINION AND ORDER
January 17, 2017

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _1/17/17_

RICHARD J. SULLIVAN, District Judge:

Zvi Goffer and Michael Kimelman each move pursuant to 28 U.S.C. § 2255 to vacate their respective convictions on insider trading charges following a June 2011 jury trial. Goffer, who continues to serve his sentence of imprisonment, and Kimelman, who is currently on supervised release, both rely on the Second Circuit's opinion in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), to argue that the Court's jury instruction in their trial was improper, that the evidence does not support a conviction, and that their counsel provided ineffective assistance by failing to raise these arguments on appeal. For the reasons set forth below, the Court disagrees and denies both motions.

## I. BACKGROUND

### A. Facts

Goffer, a proprietary trader at Schottenfeld Group LLC and later at the Galleon Group, "spearheaded" the conspiracy charged in the indictment: he paid cash for material nonpublic inside information, traded on it, and disseminated it to others. *United States v. Goffer*, 721 F.3d 113, 118–19 (2d Cir. 2013).[1] Goffer

---

[1] In deciding Defendants' motions, the Court has considered Goffer's memorandum of law in support of his motion (Doc. No. 335 ("Goffer Mem.")), the government's memorandum in opposition (Doc. No. 351), Goffer's reply (Doc. No. 348 ("Goffer Reply")), Kimelman's memorandum of law in support of his motion (Doc. No. 335 ("Kimelman Mem.")), the government's memorandum in opposition (Doc. No. 351), Kimelman's reply (Doc. No. 348 ("Kimelman Reply")), and the exhibits and declarations attached to those filings. The Court has also reviewed various letters submitted by counsel between July 2, 2015 and December 13, 2016. (Doc. Nos. 351, 352, 354, 355, 356, 357, 359, 360, 361, 362, 370.) Additionally, the Court relies on the trial transcript in this matter ("Trial Tr."), exhibits introduced at trial ("GX"), the joint appendix filed by Kimelman on appeal to the Second Circuit ("JA"),

received the tips that fueled the conspiracy from his friend Jason Goldfarb, a workers' compensation attorney who conveyed to Goffer inside information he received from two attorneys at Ropes & Gray LLP, Arthur Cutillo and Brien Santarlas, about Ropes & Gray's clients.  *Id.*  Once Goffer received that information, he distributed it through his professional network, including to his brother Emanuel Goffer and his friend Michael Kimelman, both of whom Goffer considered to be among his "inner circle," *id.* at 119, 126 – i.e., "the people closest to him that he shared all of his information with and that shared with him," as one of Goffer's co-conspirators testified at trial (Trial Tr. at 824–25; *see also* JA 2782.8 (Goffer:  "[T]hese two guys [Kimelman and Emanuel Goffer] are in the very, very tight circle of information.")).   Kimelman, a former M&A lawyer at a leading Manhattan firm, traded at proprietary trading firm Quad Capital.  *Goffer*, 721 F.3d at 119; (JA 2746, 2782.1).  Drawing on his background as an attorney, however, Kimelman also served as Goffer's informal legal advisor, providing him with insights into the meaning of legal documents associated with acquisitions that Goffer had learned of from his sources. *Goffer*, 721 F.3d at 119.  Kimelman, Goffer, and Emanuel Goffer later established their own trading firm, Incremental Capital.  *Id.* at 118.

Over the course of the conspiracy, Kimelman and Goffer traded "151 stocks within five days of each other, including 88 stocks that they both traded on the same day."  *Id.* at 118–19.  In order to facilitate this scheme, Goffer's network of informants and traders (though not Kimelman) used

prepaid cellular phones that they destroyed after each successful tip in an effort to avoid detection.  *Id.* at 119.  Additionally, while the co-conspirators communicated often, they did so "guardedly when on the phone." *Id.*  In an example captured by a government wiretap, Goffer described a tip to Kimelman as "'a good thing' but 'nothing I'm going to talk about on the telephone.'"  *Id.*  Instead, Goffer asked Kimelman to meet in person, or "in the street," whenever the two men wished to discuss sensitive information.  *Id.*

### 1.  3Com Tip

In the summer of 2007, Jason Goldfarb met with Arthur Cutillo and Brien Santarlas and informed them that he had a friend who traded stocks and was willing to pay them for information regarding corporate acquisitions and other events involving Ropes & Gray clients.  (Trial Tr. at 423, 449.)  The evidence later established that friend to be Goffer.  Cutillo and Santarlas agreed to sell tips to Goffer through Goldfarb and began to provide information. Among their tips was Bain Capital's bid to acquire 3Com.  (*Id.* at 424.)

Cutillo and Santarlas became aware of the 3Com deal by searching the Ropes & Gray internal document management system and viewing documents printed on communal office printers.   Their search yielded a "closing agenda" and "signature papers" related to the transaction, and they informed Goldfarb of their discovery; Goldfarb in turn conveyed the news to Goffer.  *Goffer*, 721 F.3d at 119.  Goffer then shared the information regarding the takeover bid with other co-conspirators, *id.*, telling at least one co-conspirator (David Plate, a Schottenfeld trader) that the information came from someone who "had [a] connection to an attorney who was working on the deal" (Trial Tr. at 798, 813). During this period, "Goffer frequently

---

and the Second Circuit's decisions in *United States v. Goffer*, 721 F.3d 113 (2d Cir. 2013), and *United States v. Goffer*, 529 F. App'x 17 (2d Cir. 2013).

convened a group of co-conspirator traders (typically including Emanuel, Kimelman, and David Plate . . . ) at a bar where the group would discuss the progress of the [3Com] takeover bid and any new information that Goffer had received regarding the plans." *Goffer*, 721 F.3d at 119.

On August 7, 2007, Goffer and other members of the conspiracy began purchasing shares of 3Com stock. *Id.* That same evening, Goffer spoke with Kimelman via phone for twenty-five minutes. *Id.* Although the call was not recorded, Kimelman purchased 94,200 shares of 3Com stock the following day. *Id.* In fact, Kimelman's trading was so active that it came to the attention of his firm's risk management team, which forbade Kimelman from purchasing additional 3Com stock. *Id.* Following the trading freeze, Kimelman sent an email to Goffer containing only a copy of his instant message conversation with the company's risk management expert. *Id.*

In addition to Kimelman, Goffer also provided details about the 3Com deal to co-conspirator Craig Drimal, a trader who, in turn, passed the information to David Slaine, another trader. *Id.* at 120. Drimal – who was not aware that Slaine was cooperating with the government – sought to recruit Slaine into the Goffer conspiracy, explaining that the inside information had come from an attorney at "Ropeson" (JA 2743) – obviously a mistaken reference to Ropes & Gray. When Slaine stated that he was "nervous about" the reliability of the lawyer source, Drimal explained that he had similarly wondered "why is this guy risking his whole [expletive] career and maybe going to jail," but that the person passing him the information (Zvi Goffer) had explained that the lawyer was being paid "a lot of dough" for the information. (JA 2737;

see also id. ("[B]ecause if I pay him 25 grand in cash, . . . that's a lot to him . . . .").)

On September 27, 2007, Goffer informed his co-conspirators that the 3Com acquisition would occur the next day. *Goffer*, 721 F.3d at 120. Specifically, Goffer had learned that signature papers for the 3Com deal had been prepared, and critically, he confirmed with Kimelman over the phone that those documents "were what they sounded like; they were something that took place at the end of a deal." *Id.* (quoting Trial Tr. at 831–32, 1067). The following day, as Goffer expected, Bain Capital announced its acquisition of 3Com, and the value of the co-conspirators' 3Com holdings increased substantially. *Id.* at 120 & n.5. Based on 3Com trades they made from early August through September 26, 2007, Goffer made a gross profit of $378,608 (JA 2450), and Kimelman made a gross profit of $260,403 (JA 2458–59, 2461–63).

At the bar later that night, Goffer informed Plate that the source of the 3Com tip needed to be paid, stated the amount of money that would need to be paid, and identified to Plate who would be contributing to the payment. (Trial Tr. at 834.) At trial, Plate could not recall the named contributors other than Drimal. (*Id.*) Because Plate "felt guilty" that he was not among those contributing, Zvi Goffer and Plate agreed that the profits Plate was owed on 25,000 3Com shares that Emanuel Goffer had purchased on his behalf would instead be contributed to the payment to be made to Zvi Goffer's source. (*Id.* at 835.) Santarlas and Cutillo later received $25,000 each from Goldfarb, who also received $25,000. (*Id.* at 435, 590.)

### 2. Axcan Tip

In November 2007, Santarlas overheard Ropes & Gray associates discussing a

client's plans to acquire Axcan. *Goffer*, 721 F.3d at 120. To confirm the story, Santarlas accessed several documents stored on the Ropes & Gray document management system regarding the upcoming acquisition. *Id.* He and Cutillo then shared the tip with Goldfarb, who passed the information to Goffer, who further conveyed it to Drimal, Plate, and possibly others. *Id.*; (Trial Tr. at 838–39). Drimal, who worked out of the offices of Galleon Group, a large hedge fund, shared the information with Michael Cardillo, a Galleon trader, again stating that the tip came from "Ropeson" attorneys. *Goffer*, 721 F.3d at 118, 120 (citing Trial Tr. at 1106). Drimal and Plate then purchased Axcan stock, an investment that garnered substantial profits. *Id.* However, as he would later admit to David Slaine, Goffer did not trade Axcan because he was concerned that trading in the little-known stock would attract regulatory attention. *Id.* (citing Trial Tr. at 657–58).

The day the Axcan transaction was publicly announced, Drimal told Cardillo that he needed funds to "take care of" the tip's source, and Cardillo provided between $16,000 and $18,000 in cash to Drimal. (Trial Tr. at 1122, 1124.) Subsequently, Drimal called Goffer to inform him that Cardillo had "some cash lying around" and would "take care of me . . . in that respect." (JA 2543.) The men arranged to meet the following day in Manhattan, and, shortly after his meeting with Drimal, Goffer delivered a bag to Goldfarb. (Trial Tr. at 194, 197.) Thereafter, Goldfarb gave $7,500 in cash to each of the Ropes & Gray tippers (Cutillo and Santarlas) and kept an additional $7,500 for himself. (*Id.* at 448.)

### 3. January 18, 2008 Conversation Between Goffer and Kimelman

At the beginning of the following year, on January 18, 2008, Goffer called

Kimelman with a question regarding information he had recently obtained from "a friend." (*See* JA 2619–21.) In the recorded call, Goffer first confirmed that Kimelman was on his cellphone (JA 2619), and then described "a friend" who was "doing . . . contract work for a company" and who "was talking to . . . the CEO," who in turn had told the friend that the "contract work" was needed because the company was "being acquired" (JA 2620). Goffer asked Kimelman whether the CEO was "allowed to say that to anybody." (*Id.*) Kimelman responded, "He's not supposed to, but it may be public," to which Goffer replied, "I'm sure it's not public." (*Id.*)

Goffer then asked whether "officers of companies [are] more comfortable speaking with lawyers," and Kimelman advised, "Yeah, because they're not supposed to say anything," and "they're bound [by] attorney client . . . confidentiality and all that." (*Id.*) After reiterating that lawyers are "not supposed to say anything," Kimelman suggested that the CEO may "just [be] doing it to protect himself." (*Id.*) Goffer refuted that notion, explaining that "it's got nothing to do with . . . the contract work . . . . I think like they're just finalizing certain things up to close." (*Id.*) After Goffer reiterated that he was just interested in knowing "if [it is] possible" that a CEO might disclose information regarding the close of a deal to a lawyer (*id.*), Kimelman asked Goffer if he "want[ed] to go for the mid-morning . . . for the meeting right now in the street" (JA 2621). Goffer and Kimelman both laughed at this comment, and then Goffer agreed to meet Kimelman "in the street." (*Id.*)

### 4. P.F. Chang's Tip

A month later, in February, Santarlas learned from a colleague of a possible takeover of P.F. Chang's China Bistro, Inc. *Goffer*, 721 F.3d at 120. He again conveyed

4

the information to Goldfarb, who shared it with Goffer. *Id.* (citing Trial Tr. at 131–34 and JA 2442–43). A few days later, Goffer phoned Kimelman and told him he had "something that we're going to need to like figure out," but Goffer explained that it was "nothing [he was] going to talk about on the telephone." *Id.* (citing JA 2631). Accordingly, at Goffer's suggestion, Kimelman traveled from his home in Westchester to meet Goffer in Manhattan to "figure out [their] plan of attack." *Id.* After the in-person discussion, Goffer, Emanuel Goffer, Drimal, and Kimelman each purchased P.F. Chang's stock; they also purchased other restaurant companies' securities in an apparent effort to disguise the fact that their P.F. Chang's trades were based on inside information. *Id.* (citing Trial Tr. at 849–50); (JA 2480–83). Goffer even instructed Kimelman that information regarding each of the securities they bought must "be printed out" so that they could "go about . . . justifying a trade" should the purchases spark regulatory interest. *Id.* (citing JA 2638). Kimelman responded, "Absolutely." (JA 2638.)

Two months later, on March 20, 2008, Santarlas accessed a document in the Ropes & Gray document management system entitled "limited guaranty" that was associated with the P.F. Chang's matter. (Trial Tr. at 488.) Later that day, Goffer called Kimelman and asked him what a "limited guarantee" meant in the context of "mergers and acquisitions." (JA 2666.) When Kimelman responded that it "depends on [the] context," Goffer elaborated that "*our guy* seems to believe that" a limited guarantee is related to a guarantee of payment and is something that "happens when . . . the directors meet and stuff like that." (*Id.* (emphasis added).) Goffer reiterated his understanding that such documentation is "part of every single deal," and "we got that." (JA 2666–67.)

### 5. Clear Channel Tip

Also in March 2008, Cutillo and Santarlas found deal documents relating to Bain Capital's acquisition of Clear Channel Communications, Inc. in what they believed to be a "closing room" at their law firm. *Id.*; (Trial Tr. at 489–90). After reviewing the documents and determining that they were ready for execution, the attorneys told Goldfarb that an acquisition was imminent. *Goffer*, 721 F.3d at 120; (Trial Tr. at 489–90). Shortly thereafter, Goffer, Kimelman, and Drimal purchased Clear Channel securities. (*See* JA 2691; Trial Tr. at 493; GX 302 at 10–11; GX 331 at GS-GOF 7457–58.)

As it turned out, however, the attorneys had misinterpreted the purpose of the room. The banks that had agreed to finance the deal were balking, and the closing room had been set up simply to establish the private equity buyers' right to sue the banks if they refused to provide the financing. (Trial Tr. at 357–58, 365.) In other words, Clear Channel and the private equity buyers were not expecting that the deal would close; rather, they were merely taking steps necessary to force the banks to finance or, more likely, subject themselves to a lawsuit. (*Id.*)

As expected, the banks ultimately refused to go through with financing, and Clear Channel along with the private equity buyers sued the banks. (*Id.* at 358–59.) It quickly became public knowledge that the deal was falling apart, and recorded phone calls between the co-conspirators at the time make clear that Goldfarb had conveyed the attorneys' mistaken impression of the closing room to Goffer, who had in turn shared that information with Drimal, Kimelman, and others. (*See* JA 2668, 2672, 2673, 2674–76, 2677–78, 2679–80, 2681–85, 2686–88, 2689, 2690–91, 2695–97.)

Clear Channel's stock plunged, and Goffer, Kimelman, and most of all Drimal (who had a larger investment at stake) suffered losses. *Goffer*, 721 F.3d at 120. After the ordeal, Goffer and Kimelman discussed how they felt sympathy for Drimal but were also upset with him for trading recklessly. (JA 2695–96.) Kimelman concluded that he and Goffer had gotten "lucky," and Goffer agreed, remarking, "Yea[h,] we dodged a big one." (JA 2697.)

Nevertheless, two months later, Cutillo and Santarlas noted renewed Clear Channel activity at their law firm. *Goffer*, 721 F.3d at 121. Cutillo passed the news to Goldfarb, who again informed Goffer. *Id.* (citing Trial Tr. at 494–95 and JA 2709–14). On May 7, 2008 – less than a week before Clear Channel publicly announced that it had settled its litigation with the banks and entered into an amended merger agreement (JA 2498) – Goffer called Kimelman and asked him what it meant "if you see . . . a couple documents together," including "a revised merger agreement . . . . [w]ith a solid sort of settlement agreement right with it" (JA 2707). Kimelman agreed with Goffer's assessment that it could mean that the parties "already had a deal and then . . . they didn't agree on it again, and then one company sued the other company, but now they're agreeing to deal again and they're basically settling the lawsuit." (JA 2707–08.)

Two days later, on May 9, Goffer contacted Kimelman to arrange for an "urgent [in-person] meeting." (JA 2715.) Immediately thereafter, Goffer called a trader who worked for his brother, Emanuel Goffer, and instructed him to purchase Clear Channel call options for Emanuel. (JA 2718–19; *see also Goffer*, 721 F.3d at 121. That same day, Goffer himself and Kimelman both began purchasing Clear Channel securities. (*See* JA 2479; GX 331

at GS-GOF 7672.) On May 12, Clear Channel publicly confirmed that it was in settlement talks with the lenders it had previously sued (JA 2497), and on May 13, after the close of business, the company announced a settlement and amended merger agreement (JA 2498–99). As a result, Clear Channel's stock value increased markedly, netting $1 million in profits for Goffer's trading account, *Goffer*, 721 F.3d at 121; (*see also* JA 2479; Trial Tr. at 1271), and over $28,000 in profits for Kimelman's account (*see* GX 331 at GS-GOF 7672–73; *see also* Doc. No. 304, Oct. 12, 2011 Sent'g Tr. at 4–5 (finding $28,000 in profits from Clear Channel trades)).

### 6. Efforts to Recruit David Slaine

In late 2007, Goffer, Kimelman, and Emanuel Goffer established their own trading firm, Incremental Capital, and attempted to recruit David Slaine to join as a partner. (Trial Tr. at 616, 703.) In essence, they hoped that Slaine would provide the financial support necessary to fund what the Second Circuit dubbed their "insider trading-fueled business." *Goffer*, 721 F.3d at 121. In fact, Kimelman even urged Goffer to tell Slaine that he would "get great information" by investing with Incremental Capital. *Id.* (quoting JA 2567). Following Kimelman's advice, Goffer subsequently met with Slaine – who, unbeknownst to Goffer, was then working with law enforcement and wearing a recording device – and revealed that he had received key tips about certain acquisitions, including 3Com, Axcan, and Hilton Hotels Corporation. *Id.* (citing JA 2752, 2754). Shortly thereafter, Slaine again met with Goffer, this time joined by the other members of the "inner circle," Emanuel Goffer and Kimelman. (JA 2782–82.18.)

In August 2008, Slaine once again met with Zvi and Emanuel Goffer and

Kimelman, who were also joined by Drimal, to further discuss Slaine's potentially joining Incremental Capital.   During that meeting, Slaine pressed Goffer on the identity and the reliability of his sources of information, to which Goffer responded: "[Y]ou don't need to know where it's coming from, you don't wanna know where it's coming from obviously[;] . . . [if] someone from the government ever ask[s] you where did it come from[,] [y]ou be like, I don't freakin' know where it came from, I had no idea[;] [t]his is another stock tip, like any other one I have ever gotten." (JA 2789.8.)   At one point, Goffer jokingly suggested that his stock tips came from a "[c]onstruction worker," which he admitted was just a "way of saying, don't worry about where it came from." (JA 2789.9.)   Kimelman then commented, sarcastically, that the source was the "[g]uy fixing that pothole down there" in the street outside. (*Id.*)

### 7.  Concerns About Excessive Trading by Craig Drimal

In February 2008, Goffer and Kimelman had a phone conversation in which they discussed their concerns about trading through the same broker-dealer used by Craig Drimal.   Specifically, Goffer worried that the volume of stock Drimal had purchased in companies that were then taken over could result in the broker-dealer "blowing the whistle on [Drimal] saying listen we got a guy [who's] hitting these takeovers." (JA 2652–53.)   Goffer opined that "some decisions ha[d] to [be] made" regarding "how much of a magnifying glass you want on you" – a view Kimelman described as "a good thought" and "one [he] constantly [went] back and forth on." (JA 2652.)

### 8.  Goffer Joins Galleon

In early 2008, Goffer joined Galleon, a hedge fund with billions of dollars under management.[2]   *Goffer*, 721 F.3d at 118; (Trial Tr. at 1074–75).   After he was hired by Galleon, Goffer asked Goldfarb to convey his thanks to Cutillo and Santarlas for the tips that had secured his new job.   In a recorded conversation in January 2008, Goffer explained to Goldfarb that, because of his new hedge fund job, he would "have a lot more money to play with," but that it would likely take longer to pay the informants their correspondingly larger "cut."   (JA 2595–96.)   In a recorded conversation later the same day, Goffer explained to Goldfarb that his new job at Galleon would "make[] hiding things so much easier, and, you know, we're going [to] keep doing things the same way, just on a little bit of a bigger scale." (JA 2601.) Goffer characterized his new position, which imposed no "monetary limits on what [he] c[ould] do," as providing him with "total camouflage." (JA 2602.)   On the same call, Goldfarb responded that the tippers were "hungry," having already spent the money they received from the 3Com tip, and that the payments provided to the informants had enabled one of them to pay for his honeymoon and the other to remodel his kitchen.   (JA 2608.)   This news prompted Goffer to reply, "I'm responsible for a honeymoon and a kitchen?   God bless." (*Id.*)   When Goldfarb explained that the tippers were "ready to replenish," Goffer

---

[2] *See United States v. Rajaratnam*, 719 F.3d 139, 144 (2d Cir. 2013) ("When Galleon was at its pinnacle, the fund employed dozens of portfolio managers, analysts, and traders, and invested billions of dollars of client funds."). Galleon closed down in 2009 after its founder, Raj Rajaratnam, was arrested on insider trading charges. *Id.* at 144–45.

replied, "Let's go man, back to the well. Back to the well." (*Id*.)

B. Prosecution, Trial, and Jury Instructions

On November 5, 2009, Goffer, Kimelman, Emanuel Goffer, Goldfarb, Drimal, Plate, and Cutillo were arrested by law enforcement officers. (*See* Docket Entries dated Nov. 5, 2009; *see also* Trial Tr. at 153.) On January 21, 2010, a grand jury returned a ten-count indictment charging Defendants with, *inter alia*, conspiracy to commit securities fraud. (Doc. No. 43.) On July 16, 2010, January 14, 2011, April 21, 2011, and April 26, 2011, Plate, Cutillo, Goldfarb, and Drimal respectively entered guilty pleas to various counts of the indictment or a superseding indictment. In May 2011, Goffer, Kimelman, and Emanuel Goffer proceeded to trial.

At trial, the government introduced testimony from Slaine, Santarlas, Plate, Cardillo, a Ropes & Gray partner, and two FBI agents. The government also introduced a number of exhibits, including (1) Slaine's recordings of conversations with Goffer, Kimelman, and others, (2) wiretap recordings of Goffer's conversations with Kimelman and others, (3) instant messages and emails sent between the co-conspirators, (4) telephone records, and (5) trading records. *Goffer*, 721 F.3d at 121.

Following the testimony and closing arguments, the Court instructed the jury that, to support an insider trading conviction,

the government must prove each of the following four things beyond a reasonable doubt:

First, that Brien Santarlas and/or Arthur Cutillo, who the indictment alleges were the insiders or tippers,

had a fiduciary or other relationship of trust and confidence with Ropes & Gray or its clients.

Second, that Brien Santarlas and/or Arthur Cutillo breached that duty of trust and confidence by disclosing material non-public information about 3Com and Axcan, obtained from their relationship with Ropes & Gray as alleged in the indictment.

Third, that the defendant you are considering knew that the information he obtained had been disclosed in violation of a duty.

And fourth, that the defendant you are considering used the material non-public information he received to purchase the security you are considering.

(Trial Tr. at 2010.) The Court further instructed the jury that the government must also establish

that Brien Santarlas and/or Arthur Cutillo personally benefited in some way, directly or indirectly, from the disclosure of the allegedly inside information to Jason Goldfarb and Zvi Goffer.

(*Id.* at 2010–11.) Elaborating on the first of the four elements above, the Court instructed the jury that "the government must prove beyond a reasonable doubt that Brien Santarlas and/or Arthur Cutillo had a fiduciary or other relationship of trust and confidence with Ropes & Gray[,] [a]nd as a result of that relationship, were trusted with material non-public information with the reasonable expectation that they would keep it confidential and would not use it for personal benefit." (*Id.* at 2011.) And with

respect to the third element above, the Court instructed the jury that the government must prove "that the defendant . . . knew that the material non-public information had been disclosed by someone in violation of a duty of trust and confidence." (*Id.* at 2014.)

The Court did not, however, provide an instruction proposed by Defendants that read:

> [T]he government must prove . . . [t]hat Brien Santarlas and Arthur Cutillo personally benefited in some way, directly or indirectly, from the disclosure of the allegedly inside information to Jason Goldfarb and Zvi Goffer and that [the] defendant you are considering was aware of those benefits received by Santarlas and Cutillo.

(Doc. No. 330-4, Shapiro Decl. Ex. 3 at 51.) Defendants had offered a blanket objection to all jury instructions that differed from their proposal. (Trial Tr. at 1577, 2059.)

Following deliberation, the jury returned a verdict of guilty on all counts. (*Id.* at 2168–74.) The Court subsequently sentenced Goffer to 120 months' imprisonment and Kimelman to 30 months' imprisonment. *Goffer*, 721 F.3d at 121.

### C.  Subsequent Procedural History and Case Law Developments

Following the jury's verdict, both Goffer (with new counsel) and Kimelman (with the same counsel) appealed their convictions to the Second Circuit. In Goffer's opening brief, his attorney Alexander Dudelson argued five separate grounds for relief. *United States v. Goffer*, No. 11-3591, Doc. No. 107 (2d Cir. Jan. 24, 2012). Kimelman also challenged his conviction on four independent grounds. *Id.* Doc. No. 85 (Jan.

23, 2012). Notably, neither defendant challenged the Court's jury instructions regarding a tippee's knowledge of the tipper's personal benefit.

On July 1, 2013, the Second Circuit issued two opinions addressing Goffer's and Kimelman's claims. The decisions affirmed the district court in all respects except for Goffer's forfeiture order, which the Second Circuit vacated and remanded for further proceedings. *See United States v. Goffer*, 721 F.3d 113 (2d Cir. 2013) (main opinion on appeal); *United States v. Goffer*, 529 F. App'x 17 (2d Cir. 2013) (supplemental opinion addressing the forfeiture order and other issues).

Following the Second Circuit's rulings, Kimelman did not further challenge his conviction on direct appeal. Goffer, by contrast, filed a *pro se* petition for a panel rehearing or rehearing *en banc*, raising for the first time the Court's failure to instruct the jury regarding a tippee's knowledge of the tipper's personal benefit, *Goffer*, No. 11-3591, Doc. No. 313 (Sept. 3, 2013), and a motion for bail pending the conclusion of his appeal, *id.* Doc. No. 302 (Aug. 6, 2013). Goffer's arguments largely echoed those made in briefs filed in *United States v. Newman*, No. 13-1837 (2d Cir.), an unrelated insider trading case. *See id.* Doc. No. 117 (Aug. 15, 2013); *id.* Doc. No. 136 (Aug. 15, 2013). The Second Circuit denied Goffer's request for bail in a two-sentence order on August 20, 2013, *id.* Doc. No. 312, and denied his motion for rehearing in a three-sentence order on November 4, 2013, *id.* Doc. No. 316.

On April 22, 2014, Goffer filed two more motions with the Second Circuit – via new counsel Yale Klat – seeking to (1) recall the court's mandate denying his appeal, *id.* Doc. No. 328, and (2) have copies of the briefs in his appeal provided to

the panel presiding over the *Newman* appeal, *id.* Doc. No. 323. The Circuit similarly denied both motions in a two-sentence order on May 22, 2014. *Id.* Doc. No. 345.

Finally, Goffer petitioned the United States Supreme Court for a writ of certiorari on May 2, 2014, *id.* Doc. No. 334, which was denied on October 6, 2014, *Goffer v. United States*, No. 13-9973, 135 S. Ct. 63 (2014).

On December 10, 2014, the Second Circuit issued its opinion in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), on which Goffer's and Kimelman's habeas motions now heavily rely. In *Newman*, the Second Circuit held that, where the government brings insider trading charges against a tippee, the Supreme Court's decision in *Dirks v. SEC*, 463 U.S. 646 (1983), requires the district court to instruct the jury that a conviction requires proof that the tippee "knew that the tipper[] received a personal benefit for [his] disclosure" – not simply proof that the tippee "knew the information he obtained had been disclosed in breach of a duty." *Newman*, 773 F.3d at 450–51. Applying this rule, the Second Circuit concluded that the district court's instructions – which did not specifically instruct the jury that the government had to prove knowledge of receipt of a personal benefit – were in error because "a reasonable juror might have concluded that a defendant could be criminally liable for insider trading merely if such defendant knew that an insider had divulged information that was required to be kept confidential." *Id.* at 450. The *Newman* court also held that, if the alleged personal benefit is the gift of confidential information to a trading relative or friend, the government must prove that the tipper and tippee possessed "a meaningfully close personal relationship that generate[d] an exchange that [wa]s objective,

consequential, and represent[ed] at least a potential gain of a pecuniary or similarly valuable nature" to the tipper. *Id.* at 452. The court found that the government failed to prove the defendants' knowledge of a receipt of a personal benefit that met this threshold. *Id.* at 451–55.

Recognizing the similarities between the jury charge in the *Newman* case and the one given in their own, Goffer and Kimelman filed the instant motions to vacate their convictions – Goffer on January 22, 2015 (Doc. No. 315), and Kimelman on March 12, 2015 (Doc. No. 328). Their motions were fully submitted on May 29, 2015 (Doc. No. 348) and May 18, 2015 (Doc. No. 346), respectively.

On January 19, 2016, the Supreme Court granted certiorari in *Salman v. United States*, No. 15-628, a Ninth Circuit case that had declined to follow *Newman*'s holding with respect to when a gift constitutes a personal benefit.[3] On December 6, 2016, the Supreme Court issued its decision, reaffirming its holding in *Dirks* that, "when a tipper gives inside information to 'a trading relative or friend,' the jury can infer that the tipper meant to provide the equivalent of a cash gift" since, "[i]n such situations, the tipper benefits personally because giving a gift of trading information is the same thing as trading by the tipper

---

[3] On October 21, 2016, Goffer filed a petition for writ of mandamus from the Second Circuit, seeking an order directing this Court to adjudicate his pending habeas motion. *Goffer v. United States*, No. 16-2568, Doc. No. 1 (2d Cir.). The Second Circuit denied Goffer's petition on November 22, 2016, holding that it was not "'a clear abuse of discretion or a usurpation of judicial power'" for this Court to "defer[] its ruling pending decision by the Supreme Court in *Salman v. United States*, No. 15-628." *Id.* Doc. No. 34 (quoting *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 233 (2d Cir. 1993)).

followed by a gift of the proceeds." *Salman v. United States*, 137 S. Ct. 420, 428 (2016). The Supreme Court further held that *Newman*'s requirement that "the tipper must also receive something of a 'pecuniary or similarly valuable nature' in exchange for a gift to family or friends" was "inconsistent with *Dirks*." *Id.* However, the Supreme Court explicitly declined to address the Second Circuit's reversal of the *Newman* defendants' convictions on the ground that "the [g]overnment introduced no evidence that the defendants knew the information they traded on came from insiders or that the insiders received a personal benefit in exchange for the tips." *Id.* at 425 n.1. Following the *Salman* decision, Kimelman's counsel filed a letter on December 13, 2016 asserting that *Salman* did not impact *Newman* insofar as *Newman* supports vacatur of Kimelman's conviction. (Doc. No. 370.)

In their respective habeas motions, both Goffer and Kimelman argue that the Court's jury charge in their trial was improper under *Newman*, that the evidence does not support their convictions under *Newman*, and that their counsel provided ineffective assistance by failing to raise these arguments on direct appeal. The government disputes these claims and argues that Defendants' jury instruction claim is procedurally barred.

## II. Legal Standard

Section 2255 enables a prisoner who was sentenced by a federal court to petition that court to vacate, set aside, or correct the sentence on the grounds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Relief under

Section 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks omitted). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omitted).

One such rule is the "procedural default rule," which "prevents claims that could have been brought on direct appeal from being raised on collateral review absent cause and prejudice." *Id.* at 54. In other words, "'[i]n order to raise a claim that could have been raised on direct appeal, a [Section] 2255 petitioner must show cause for failing to raise the claim at the appropriate time and prejudice from the alleged error.'" *Id.* (quoting *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993)).

Constitutionally ineffective assistance of counsel is sufficient cause for excusing a procedural default. *McCleskey v. Zant*, 499 U.S. 467, 493–94 (1991).[4]   The Sixth

---

[4] In addition to constituting "cause" that would overcome a procedural bar – though with little difference practically speaking – constitutionally ineffective assistance of counsel can be raised as a separate ground for habeas relief that is not subject to the procedural default rule. *See Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (a claim for ineffective assistance "may appropriately be raised for the first time in a [Section] 2255 motion, 'whether or not the petitioner could have raised the claim on

Amendment to the United States Constitution guarantees a criminal defendant's right to the assistance of counsel. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."). When challenging the effectiveness of counsel's assistance, a party must demonstrate both of the prongs set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), specifically, that (1) counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms," and (2) this "deficient performance prejudiced the defense" in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88, 694. A court must reject a movant's ineffective assistance of counsel claim if it fails to meet either prong. *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (citing *Strickland*, 466 U.S. at 687, 690, 694, and *Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011)).

When evaluating counsel's conduct, a court must do so "on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690). "Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." *Gibbons v. Savage*, 555 F.3d 112, 122 (2d Cir. 2009) (citing *Strickland*, 466 U.S. at 690–91); *see also Strickland*, 466 U.S. at 690 ("strategic

choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). In that regard, the Supreme Court has further held that a defendant does not have a constitutional right to insist that appellate counsel raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 750–51 (1983). Instead, "counsel, as a matter of professional judgment," must decide which arguments to present to the appellate court. *Id.* at 751. The Supreme Court has observed that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751–52; *see also Smith v. Murray*, 477 U.S. 527, 536 (1986) ("Th[e] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail . . . is the hallmark of effective appellate advocacy." (quoting *Jones*, 463 U.S. at 751–52)). Indeed, any standard requiring appellate counsel "to raise every 'colorable' claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy." *Jones*, 463 U.S. at 754. Thus, to establish ineffective assistance based on a failure to raise a viable argument, a petitioner must show that counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo*, 13 F.3d at 528. Overall, however, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

A petitioner can alternatively overcome a procedural default if he can establish actual innocence, i.e., that "'in light of all the evidence,'" it is "'more likely than not that no reasonable juror would have convicted him.'" *United States v. Thorn*,

direct appeal'" (quoting *Massaro v. United States*, 538 U.S. 500, 504 (2003))).

659 F.3d 227, 233–34 (2d Cir. 2011) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## III. DISCUSSION

As noted above, Goffer and Kimelman argue that the Court's jury charge in their trial was improper under *Newman*, that the evidence did not support their convictions under *Newman*, and that their counsel provided ineffective assistance by failing to raise these arguments on direct appeal, which requires vacatur of their convictions. In opposing these arguments, the government asserts that Defendants' jury instruction claim is procedurally barred since *neither* defendant pursued it on direct appeal. Defendants do not dispute that they could have done so. (*See* Goffer Mem. at 10–11; Goffer Reply at 4–13; Kimelman Mem. at 23–25.) However, because Goffer and Kimelman both insist that their appellate counsel provided ineffective assistance by failing to raise *Newman* issues on direct appeal, the Court will first address these arguments. The Court will then address actual innocence, which would be an independent basis for excusing Defendants' procedural default.

### A. Ineffective Assistance of Counsel

Both Goffer and Kimelman claim that their respective counsel's failure to challenge the jury instruction under *Newman* on direct appeal constitutes ineffective assistance of counsel. The Court disagrees.[5]

To begin with, appellate counsel for both Defendants filed substantial briefs with the Second Circuit that raised a number of grounds for reversal and give this Court no reason to disturb the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Indeed, Goffer's appellate counsel filed a 56-page brief asserting five separate grounds for reversal of Goffer's conviction, including that: (1) the Court erroneously instructed the jury on the definition of material, nonpublic information, (2) the Court unconstitutionally punished Goffer for exercising his right to go to trial, (3) Goffer's trial counsel was ineffective for failing to object to a four-point sentencing offense level increase for playing a leading role in a criminal organization, under U.S.S.G. § 3B1.1, (4) the sentence imposed was disproportionate to those received by similarly situated defendants, and (5) the Court's $10 million forfeiture order erroneously included proceeds realized by Goffer's employers. *See Goffer*, No. 11-3591, Doc. No. 107. Goffer's appellate counsel successfully obtained vacatur of the forfeiture order based on the fifth argument, *Goffer*, 529 F. App'x at 20, and of course the mere fact that the remaining arguments were unsuccessful does not render counsel's representation ineffective, *see Mayo*, 13 F.3d at 533 (courts "may not use hindsight to second-guess [counsel's] strategy

---

[5] Defendants do not contend that their *Newman* argument "is so novel that its legal basis [wa]s not reasonably available to counsel," thus establishing "cause for [their] failure to raise the claim" on direct appeal. *Reed v. Ross*, 468 U.S. 1, 16 (1984). In any event, such an argument would have no merit, given that (1) Defendants in fact sought a knowledge-of-

the-benefit instruction at trial, and (2) as both Defendants concede (*see* Goffer Mem. at 25; Kimelman Mem. at 20–21), the interpretation of *Dirks* ultimately adopted by *Newman* was "'percolating in the lower courts'" long before Defendants' direct appeal, *see United States v. Whitman*, 115 F. Supp. 3d 439, 443 (S.D.N.Y. 2015) (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986)); *see also Newman*, 773 F.3d at 449 (collecting cases dating back to 1984).

choices"); *see also Strickland*, 466 U.S. at 689 (noting that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable").

Kimelman's counsel (who represented Kimelman both at trial and on appeal) was similarly thorough.  Following the jury's guilty verdict, Kimelman's counsel filed a 25-page brief in support of motions for acquittal and for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, challenging the sufficiency of the evidence on which the jury convicted Kimelman as well as the Court's jury instruction on conscious avoidance of the knowledge necessary to support a conviction.  (*See* Doc. No. 225.)  At oral argument on those motions, the Court praised Kimelman's counsel for the quality of his advocacy on Kimelman's behalf.  (*See* Doc. No. 303, Oct. 7, 2011 Oral Arg. Tr. at 20 ("Mr. Sommer did a masterful job [during his summation] of taking arguments and tying them to the evidence or lack of evidence.")); *see also If The Phone Is Legit, You Must Acquit*, Business Insider, June 6, 2011, http://www.businessinsider.com/if-the -phone-is-legit-you-must-acquit-sommers-closing-remarks-part-2-on-behalf-of-michael -kimelman-in-zvi-goffer-insider-trading-trial -2011-6 (last visited Jan. 17, 2017) ("Mr. Sommer, a marvelously talented attorney from Wilson, Sonsini Goodrich & Rosati, laid out for the jury a powerful defense of his client, clearly trying to distinguish the evidence (or lack thereof) against his client from the evidence against the other two defendants."); *Sommer Sensation:  Closing Argument on Behalf of Michael Kimelman at Zvi Goffer Trial*, Business Insider, June 3, 2011, http://www.businessinsider.com/ sommer-sensation-closing-argument-on-behalf-of-michael-kimelman-at-zvi-goffer-trial-2011-6 (last visited Jan. 17, 2017).  On

direct appeal, Kimelman's counsel filed a 102-page brief raising a number of grounds for reversal, including:  (1) challenging the sufficiency of the evidence that Kimelman knew he had received inside information about 3Com, (2) contesting the Court's conscious avoidance instruction, (3) arguing that wiretap evidence was inadmissible, and (4) challenging the preclusion of evidence that Kimelman rejected a plea deal that would have allowed him to avoid jail time.  *Goffer*, No. 11-3591, Doc. No. 85.  And as with Goffer's appellate counsel's performance, the mere fact that Kimelman's counsel's arguments were ultimately unsuccessful does not constitute ineffective assistance.  *See Strickland*, 466 U.S. at 689; *Mayo*, 13 F.3d at 533.

Despite the foregoing, Goffer and Kimelman argue that their counsel rendered constitutionally ineffective representation because they failed to challenge on appeal the Court's jury instruction regarding Defendants' knowledge of the benefit received by Santarlas and Cutillo.  However, Defendants' counsel had no duty to raise this argument simply because it may have been non-frivolous, and Defendants fail to demonstrate that the omitted jury instruction argument was "significant and obvious" while the pursued theories described above "were clearly and significantly weaker." *Mayo*, 13 F.3d at 533.  Indeed, at the time Defendants filed their appellate briefs, the Second Circuit had not held that a separate instruction regarding a defendant's knowledge of the tipper's receipt of a personal benefit was required to convict an individual of insider trading.

Instead, prior to the submission of Defendants' appeals, the Second Circuit in *SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012), articulated the standard for tippee liability as requiring that "(1) the tipper breached a duty by tipping confidential information," and

"(2) the tippee knew or had reason to know that the tippee improperly obtained the information (i.e., that the information was obtained through the tipper's breach)." *Id.* at 289. Significantly, the Second Circuit in *Obus* did not require proof that the tippee knew of a personal benefit received by the tipper. *See id.* at 292–93. Additional decisions leading up to *Newman* likewise implied the absence of such a knowledge element. For instance, in *United States v. Jiau*, 734 F.3d 147 (2d Cir. 2013), the Second Circuit listed the elements of the crime in a manner indicating that the "personal benefit" requirement does not include a tippee-knowledge component that is distinct from the tippee's knowledge of the tipper's breach:

> To hold [a defendant] criminally liable for insider trading, the government [must] prove each of the following elements beyond a reasonable doubt: (1) the insider-tippers . . . were entrusted the duty to protect confidential information, which (2) they breached by disclosing [the information] to their tippee . . . , who (3) knew of [the tippers'] duty and (4) still used the information to trade a security or further tip the information for [the tippee's] benefit, and finally (5) the insider-tippers benefited in some way from their disclosure.

*Id.* at 152–53. Similarly, in *SEC v. Contorinis*, 743 F.3d 296 (2d Cir. 2014), the Second Circuit described "the tipper-tippee situation" as one in which "the tipper breaches a fiduciary duty by disclosing inside information; the tippee trades on that information, knowing of the breach and without disclosing what he knows; and the tipper obtains 'a direct or indirect personal benefit from the disclosure.'" *Id.* at 311 (quoting *Dirks*, 463 U.S. at 663); *see also*

*United States v. Steinberg*, 21 F. Supp. 3d 309, 314 (S.D.N.Y. 2014) (observing that "[s]everal more recent Second Circuit cases . . . have implied that the tipper's 'breach of duty' refers solely to the tipper's unauthorized disclosure and does not include the tipper's benefit," and that, "[i]n these cases, breach of duty and benefit are treated as distinct elements, each of which must be separately proven for tipper and tippee liability, but only the first of which must be known by the tippee" (citing *Obus*, *Jiau*, and *Contorinis*)); J. Kelly Strader, *(Re)conceptualizing Insider Trading:* United States v. Newman *and the Intent to Defraud*, 80 Brook. L. Rev. 1419, 1437–38 (2015) ("*Newman* attempted to resolve conflicting standards that the Second Circuit had applied to tippee liability over the years."); A.C. Pritchard, Dirks *and the Genesis of Personal Benefit*, 68 SMU L. Rev. 857, 873 (2015) (the tippee liability standard articulated in *Newman* "marked a sharp departure from *Obus* – which allowed tippee liability on a simple showing of awareness of a breach of confidentiality – and a return to *Dirks*' requirement of knowledge of a personal benefit to the tipper"); Donald C. Langevoort, Newman *and Selective Disclosure*, CLS Blue Sky Blog (Jan. 28, 2015), http://clsbluesky. law.columbia.edu/2015/01/28/newman-and-selective-disclosure (the Second Circuit's statement in *Obus* "that personal benefit is a stand-alone element disconnected from either the tipper's motivation or the tippee's state of mind" was an "artifact[] from [a] meandering twenty-five year journey" away from *Dirks*).

Interestingly, the panel in *Newman* did not purport to depart from *Obus*, *Jiau*, or *Contorinis*. It instead criticized the government for "selectively parsing . . . dictum" from these cases in aid of "the doctrinal novelty of its recent insider trading prosecutions." *Newman*, 773 F.3d at 447–

48; *see also id.* at 448 (explaining that the government was mistaken to rely on *Jiau*'s "cursory recitation of the elements" of insider trading because the *Jiau* court had no need "to reach the question of whether knowledge of a breach requires that a tippee know that a personal benefit was provided to the tipper"). The *Newman* panel noted that these prior cases "generally involved tippees who directly participated in the tipper's breach (and therefore had knowledge of the tipper's disclosure for personal benefit) or tippees who were explicitly apprised of the tipper's gain by an intermediary tippee," and the panel expressed concern that the government had been literally applying the liability standard articulated in these prior cases to prosecute "remote tippees many levels removed from corporate insiders." *Id.* at 448.

Nevertheless, in light of the Second Circuit cases predating *Newman*, the Court finds that it was not unreasonable for Defendants' counsel to have failed to anticipate the Second Circuit's *Newman* ruling or to reflexively file emergency motions in Defendants' fully submitted appeals when the Second Circuit released the *Newman* defendants on bail pending appeal. Indeed, although the *Newman* court – perhaps recognizing the tension between its own precedent and the case before it – opined that its holding "follow[ed] naturally from *Dirks*," *id.* at 447, no court has yet determined that the holding in *Newman* followed so naturally that it was *objectively unreasonable* for counsel to rely on then-existing Second Circuit precedent, however less naturally that precedent might have followed from *Dirks*. Nor does this Court see any basis for reaching that conclusion here. *See United States v. Kimber*, 777 F.3d 553, 563 (2d Cir. 2015) ("[A]n attorney is not required to forecast changes or advances in the law in order to provide effective assistance."); *Mayo*, 13 F.3d at 533

("Counsel is not required to forecast changes in the governing law."); *see also In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) ("[A Second Circuit] panel is bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of [the Second Circuit] or by the Supreme Court." (internal quotation marks omitted)).

Alternatively, even if one takes the view that, at the time of Defendants' direct appeal in this case, Second Circuit precedent required a district court to instruct the jury on a tippee's knowledge of the tipper's personal benefit, counsel's decision to forgo that argument on appeal was justified on tactical grounds. In the case of Goffer, the proof of his knowledge of the benefit received by Santarlas and Cutillo was so overwhelming that it would have been pointless to argue otherwise, even if a *Newman*-style jury instruction had been given. The evidence at trial demonstrated not merely that Goffer was aware of the benefits received by the breaching attorneys, but that he orchestrated them. (*See, e.g.*, Trial Tr. at 834–35 (after announcement of 3Com deal, Goffer told Plate he needed to pay his source); *id.* at 194, 197 (Goffer delivered a bag of cash to Goldfarb, who then paid Santarlas and Cutillo); JA 2608 ("I'm responsible for a honeymoon and a kitchen? God bless.").) In light of this insurmountable evidence, appellate counsel would have been reasonable in concluding that, even if he could persuade the panel to overturn or limit the language of *Obus* the way the *Newman* panel ultimately did, any error in the Court's jury instruction would have been deemed harmless in the face of Goffer's own recorded statements. *See United States v. Gomez*, 580 F.3d 94, 100 (2d Cir. 2009) ("[O]mitted element errors are subject to harmless error analysis." (citing *Neder v. United States*, 527 U.S. 1, 10 (1999))).

16

Moreover, the fact that Goffer specifically instructed his counsel to raise a *Newman*-style argument on appeal – months after Goffer's appeal had been submitted but before it had been decided – does not change the Court's conclusion. Specifically, Goffer contends that, after his appeal was fully submitted and argued but before the Second Circuit issued its opinions, he became aware of the Second Circuit's June 18, 2013 order granting the *Newman* defendants bail pending appeal. (Goffer Mem. at 8.) Goffer claims that, as a result, he instructed his counsel to raise the same jury instruction issue in his own appeal, but that his counsel failed to do so and left for a vacation in Italy, thereby rendering ineffective assistance. (*Id.* at 8 n.9.) Of course, the law is clear that a defendant does not have the constitutional right to insist that his counsel raise every non-frivolous issue on appeal. *See Jones*, 463 U.S. at 750–51; *see also id.* at 754 (any standard requiring appellate counsel "to raise every 'colorable' claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy"). This is particularly applicable under the circumstances described by Goffer, in which the argument he directed his counsel to raise – long after the appeal was submitted – may well have been waived. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief."). Rather, Goffer's counsel was entitled to exercise "professional judgment" over whether to raise the *Newman* argument, and for the reasons discussed above, the decision not to raise that argument – particularly at an extremely late procedural stage – was not objectively unreasonable. Accordingly, Goffer has demonstrated neither cause for his procedural default nor

any basis for a standalone ineffective assistance claim.

So too with Kimelman. Again, it bears noting that Kimelman's counsel – Michael Sommer – did not simply overlook the *Newman*-style argument that the Second Circuit subsequently adopted. On the contrary, Mr. Sommer raised the issue at trial in his proposed jury instructions and preserved it for appeal. (*See* Doc. No. 330-4, Shapiro Decl. Ex. 3 at 51; Trial Tr. at 1577, 2059.) Obviously, the decision to forgo it in his appellate brief was a tactical one that is entitled to significant deference and cannot lightly be dismissed. *See Strickland*, 466 U.S. at 690 (counsel is "strongly presumed" to have acted reasonably, and informed tactical decisions are "virtually unchallengeable"). A review of Kimelman's strategy through trial, post-trial motions, and ultimately on direct appeal demonstrates why this is so. At each of these stages, Kimelman's principal argument was that there was no evidence that he knew he was receiving information from insiders or that he had any role whatsoever in the conspiracy. Indeed, in his opening statement to the jury, Mr. Sommer argued that the government would introduce "not a single recording" that proved Kimelman "was told about insiders at the time he made any trades." (Trial Tr. at 120.) Mr. Sommer also pointed out that "every single person identified in th[e] indictment had one or more secret phones" and "was involved with payment for information" except Kimelman, who "was never given such a phone," "never used such a phone," and was not involved in any payment. (*Id.* at 121.) Similarly, in his summation, Mr. Sommer argued that Kimelman "was never a member of any conspiracy, he was never told about any insider source, he was never told about any lawyers at Ropes & Gray, he never had a prepaid phone, [and] he never paid a penny for information." (*Id.* at 1861–

62.)   Mr. Sommer also relied on Kimelman's reputation as a "Monday morning quarterback," which he argued was "[i]rrefutable proof" that Kimelman "was not getting inside information ahead of time" and "was not a member of the conspiracy." (*Id.* at 1948–49.) This line of argument continued in Rule 29 and Rule 33 post-trial motions, where Mr. Sommer argued that, "most critically, even if the jury assumed that Zvi Goffer and Mr. Kimelman did in fact discuss 3Com . . . , there was no evidence from which the jury could have properly concluded beyond a reasonable doubt that Zvi Goffer tipped Mr. Kimelman about a 3Com insider . . . , and ample evidence which disproved that very assumption." (Doc. No. 225, Rule 29/33 Mem. at 8.)   Those motions further purported to identify "eleven independent pieces of evidence that, standing alone, create a reasonable doubt as to Mr. Kimelman's membership in the alleged conspiracy." (*Id.* at 24–25.) Finally, on direct appeal, in a 102-page brief, Mr. Sommer led with, "[T]he Government failed to present any evidence whatsoever that Mr. Kimelman was aware of a tip from an insider" when he traded.   *Goffer*, No. 11-3591, Doc. No. 85, Appellant Br. at 1.

In light of the above, the Court finds that Mr. Sommer – a former Assistant United States Attorney and veteran white collar criminal defense lawyer, Fellow of the American College of Trial Lawyers, "New York Super Lawyer" for 11 years running, one of 30 "National Stars" recognized by the Benchmark Litigation Survey in the area of white collar criminal defense, and former *American Lawyer's Litigation Daily* "Lawyer of the Week" – exercised permissible professional judgment in "focusing on . . . a few key issues," *Jones*, 463 U.S. at 752, and that he was not obliged to gamble that a post-*Obus* panel of the Second Circuit would have been receptive to a *Newman*-style claim that might have undercut arguments deemed more central to the defense's overarching theory.   Indeed, given *Strickland*'s instruction that such tactical choices are "virtually unchallengeable," 466 U.S. at 690, the fact that Kimelman now wishes he had pursued a different course on appeal is of no moment. Moreover, even if such hindsight-based arguments were permissible, it was certainly not improper, much less ineffective assistance, for counsel to conclude that a hyper-technical argument based on a "lesser included defense" – i.e., an assertion that "even if Kimelman *did* know he was receiving improperly disclosed inside information from lawyers working on various takeovers, he never knew what, if any, *benefit* they received" – would potentially undermine his primary arguments.   Accordingly, given that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, the Court may not, and will not, "use hindsight to second-guess his strategy choices," *Mayo*, 13 F.3d at 533 (citing *Lockhart v. Fretwell*, 506 U.S. 364, 371–72 (1993)).

Thus, neither Goffer nor Kimelman has demonstrated that counsel's decision to forgo a *Newman*-style argument, "viewed as of the time of counsel's conduct," *Strickland*, 466 U.S. at 690, "fell below an objective standard of reasonableness" measured against "prevailing professional norms," *id.* at 687–88.

### B.   Actual Innocence

Because Defendants fail to establish ineffective assistance (whether as cause for their procedural default or as a standalone claim), their motions may only be salvaged by an assertion of "actual innocence."   *See*

*Bousley*, 523 U.S. at 622–23. The Supreme Court has explained that "'actual innocence' means factual innocence, not mere legal insufficiency." *Id.* at 623 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). The standard requires a petitioner to demonstrate that his actions "have been ruled not to constitute criminal conduct." *Underwood v. United States*, 166 F.3d 84, 88 (2d Cir. 1999). "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him" on the basis of the record presented at trial. *Bousley*, 523 U.S. at 623 (internal quotation marks omitted) (citing *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)).

Goffer, for his part, has waived an actual innocence claim by insisting that the procedural default rule has "[n]o bearing whatsoever on [his] habeas petition" because "[he] is presenting nothing other than a claim of ineffective assistance of appellate counsel." (Goffer Reply at 5.) Regardless, any such claim would have been frivolous in light of the overwhelming evidence that Goffer personally directed cash payments to Santarlas and Cutillo through Goldfarb and knew his sources received those payments. (*See, e.g.*, JA 2608 ("I'm responsible for a honeymoon and a kitchen? God bless.").) Indeed, it is perhaps telling that, while Goffer purports to challenge the Court's jury instruction under *Newman*, his argument has little to do with the error the Second Circuit found in that case. Specifically, Goffer does not claim that he lacked knowledge of the existence of a personal benefit. Rather, he argues that the evidence failed to show that he knew the sources he was paying were "true insiders," as opposed to persons who had obtained nonpublic information by some means other than their positions of confidentiality. (Goffer Mem. at 27–28; *see also id.* at 29

("Goffer did not know who he was causing to be paid.").) At bottom, this is not a *Newman* argument at all, but rather an attempt to challenge the sufficiency of the evidence as it pertains to a different element – whether the information came from an insider.

The evidence belies even this assertion. Goffer well knew the nature and source of the material nonpublic information on which he was trading, as reflected by the fact that he "provided details about" the 3Com acquisition "and the sources of his information to Drimal," who explained to another co-conspirator "that the information came from an attorney from 'Ropeson' [Ropes & Gray] who risked 'his whole . . . career and maybe going to jail' by sharing these tips." *Goffer*, 721 F.3d at 120. Similarly, Goffer told Plate that the information on the 3Com deal came from someone who "had [a] connection to an attorney who was working on the deal." (Trial Tr. at 813.) Moreover, Goffer regularly solicited advice from Kimelman, a former attorney, on the meaning of certain merger-related legal documents that he had learned of from Goldfarb, which makes clear that Goffer knew he was receiving information relating to documents typically handled by lawyers (i.e., insiders). In addition, Goffer's repeated payments to his sources and his message to Goldfarb that his new job at Galleon would mean higher payouts for those sources also shows that Goffer understood his sources to be insiders with ongoing access to confidential information, rather than mere non-insider eavesdroppers who had fortuitously gained access to the information.

On top of all this, the record is replete with evidence that Goffer believed he was engaging in illicit behavior: as the Second Circuit put it, he "took steps to disguise his wrongdoings by distributing disposable cell

phones, using fake research to cover his illegal trades, and refusing to speak about sensitive topics on the telephone." *Goffer*, 721 F.3d at 131. Indeed, Goffer regularly discussed the need for secrecy and discretion with co-conspirators (*see* JA 2601–02 (Goffer explaining to Goldfarb how his new job would "make[] hiding things so much easier" and provide "total camouflage"); JA 2652–53 (Goffer expressing concern to Kimelman that sharing a broker-dealer with Drimal might attract too large of a "magnifying glass" and that the broker-dealer may "blow[] the whistle" on Drimal for "hitting . . . takeovers")), and, in one notable instance, Goffer advised a co-conspirator that "you don't need to know" where the inside information is coming from, "you don't wanna know where it's coming from," and "[if] someone from the government ever ask[s] you where did it come from[,] [y]ou be like, I don't freakin' know where it came from" (JA 2789.8). Furthermore, the fact that Goffer – in the words of the Second Circuit – "spearheaded" and "orchestrated and ran" this "large-scale cash-for-tips scheme" and carried out "a double-blind, high-volume insider trading network," *Goffer*, 721 F.3d at 118, 131, demonstrates that he was familiar with all of the conspiracy's operations, including the nature of the individuals who were being paid handsomely to provide the tips that were vital to that conspiracy's existence.

Moreover, Goffer knew the legal consequences of being caught trading on the information he was receiving: in a recorded call with Goldfarb in February 2008, Goffer expressed alarm because he believed Goldfarb might have purchased eight hundred $35 call options vesting in March for a stock that was trading at $28. (*See* JA 2642–45.) Goffer explained to Goldfarb that a trade of that size on inside information meant that someone was "going directly to

jail[,] so don't let it be you," because it is "a ticket right to the [expletive] big house"; "[t]hat person's dead"; "[t]hat's so illegal." (JA 2643.) After Goldfarb assured Goffer that he had not made the trade in question, Goffer remarked, "Perfect, alright then you know what? All it does is give me more cover, God bless America." (*Id.*)

Put simply, in light of this evidence, Goffer's contention that he did not know he was paying insiders, as opposed to some non-insider source, is utterly meritless, as is any suggestion that he did not know that the insiders were receiving cash benefits.

Unlike Goffer, Kimelman raises a claim hewing to the jury instruction issue in *Newman*, specifically, that the government failed to prove that he knew the conspiracy's sources were receiving a personal benefit for their tips. (Kimelman Mem. at 1–2.) But even though the evidence of Kimelman's knowledge is not as overwhelming as the evidence with respect to Goffer, substantial evidence in the trial record nevertheless demonstrates that Kimelman either possessed actual knowledge or consciously avoided knowledge of the fact that insiders had received personal benefits in exchange for disclosing the inside information Kimelman received.

Before addressing the evidence, it is important to recall precisely what inference the law requires that evidence to support. In *Salman*, the Supreme Court reaffirmed the longstanding requirement set forth in *Dirks* that, "when a tipper gives inside information to 'a trading relative or friend,' the jury can infer that the tipper meant to provide the equivalent of a cash gift" since, "[i]n such situations, the tipper benefits personally because giving a gift of trading information is the same thing as trading by the tipper followed by a gift of the proceeds." *Salman*, 137 S. Ct. at 428. In so ruling, the Court

rejected the Second Circuit's holding in *Newman* that *Dirks* set a higher threshold for a "personal benefit" that requires "'proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature.'" *Id.* at 425 (quoting *Newman*, 773 F.3d at 452), 428.

To be clear, there has never been a dispute here that Santarlas and Cutillo actually received a personal benefit for their tips – they received tens of thousands of dollars in cash – and so *Salman*'s abrogation of *Newman* does not go to the heart of Kimelman's motion. Nevertheless, Kimelman now insists that he never *knew* that Goffer's sources were receiving a personal benefit, and *Salman*'s holding is relevant in that regard. *Salman*'s reaffirmation of *Dirks* makes clear, as it was before *Newman*, that something as minimal as a gift of confidential information to a trading friend can satisfy the personal benefit requirement. *See Salman*, 137 S. Ct. at 423 (citing *Dirks*, 463 U.S. at 664). And, critically, *Newman* requires the government to prove only that a tippee knew or should have known "that the tipper[] received *a* personal benefit." *Newman*, 773 F.3d at 450 (emphasis added); *see also Dirks*, 463 U.S. at 660 (a tippee is liable where he trades on inside information and "knows or should know that there has been a breach").

In other words, the tippee need only have known of the tipper's receipt of *a* personal benefit, not that the tippee knew of the *specific* personal benefit actually received by the insider. Indeed, a requirement along the latter lines – which is what Defendants requested in their jury charge (*see* Doc. No. 330-4, Shapiro Decl. Ex. 3 at 51 (seeking an instruction that Defendants must have been "aware of those benefits received by Santarlas and Cutillo"))

– would allow an insider trader to avoid liability simply by blinding himself to the nature of compensation paid to his sources through an intermediary. Thus, by repeatedly contending that the government failed to prove that he knew Goffer's insiders were receiving *cash*, Kimelman misapprehends the law. (*See, e.g.*, Kimelman Mem. at 11 ("[H]ad the jury been properly instructed, it could not have found Kimelman guilty because there was no evidence that he knew that the insiders who provided the information *were being paid* to do so." (emphasis added)); *id.* at 19 ("To establish conscious avoidance, there must be evidence that the defendant was aware of a high probability that the insiders *were being paid* and consciously avoided confirming that fact." (emphasis added) (internal quotation marks omitted)); *see also id.* at 2, 3, 5, 8, 15–17 & n.7, 18, 24 (making similar arguments).) In short, Kimelman need only have known or consciously avoided knowing the fact that Goffer's sources were receiving any benefit that qualifies under *Dirks*. And critically for Kimelman's case, such a finding may be "'based entirely on circumstantial evidence.'" *Goffer*, 721 F.3d at 124 (quoting *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008)).

Turning to the evidence, the Court finds that, even with a *Newman* instruction, the jury would have concluded that Kimelman knew or consciously avoided knowing that the information he traded on came from insiders who had received a personal benefit for passing that information along.[6]

_____

[6] Significantly, the Second Circuit upheld the Court's conscious avoidance instruction. (*See* Trial Tr. at 2019 ("[A] defendant's knowledge may be established by proof that the defendant . . . deliberately closed his eyes to what otherwise would have been obvious to him."), *quoted and discussed in Goffer*, 721 F.3d at 126–28 & n.11); *see also United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003)

Specifically, the government's evidence showed that Kimelman was aware of the characteristics of the conspiracy's sources, namely, that they were attorneys or similarly situated insiders.   On multiple occasions, Kimelman – a former M&A lawyer for Sullivan & Cromwell (JA 2746) – counseled Goffer on the meaning and significance of merger-related documents.   For example, Kimelman confirmed for the group that the 3Com signature papers "were what they sounded like; they were something that took place at the end of a deal."   (Trial Tr. at 831–32 (Plate testimony).)  In addition, after Goffer received the P.F. Chang's tip, Goffer and Kimelman discussed the meaning of a "limited guarantee" in the "mergers and acquisitions" context.  (JA 2666.)  Likewise, after Goffer received the tip that the Clear Channel acquisition might be back on after a dispute with the banks, Goffer and Kimelman discussed what it meant to see "a revised merger agreement" together with "a solid sort of settlement agreement."   (JA 2707–08.)   Given his legal background, Kimelman was not only able to explain the documents to Goffer; he also surely knew that such documents are not made freely available to the public, but rather are closely guarded by the attorneys and other professionals working on those documents. Indeed, in a recorded phone call from January 2008, when Goffer asked Kimelman whether a CEO would be likely to disclose information regarding his company's potential acquisition to a lawyer, Kimelman advised Goffer, "Yeah, because [lawyers are] not supposed to say anything," and "they're bound [by] attorney client . . . confidentiality and all that."   (JA 2620.)

("[A] conscious avoidance instruction to the jury permits a finding of knowledge even where there is no evidence that the defendant possessed actual knowledge." (internal quotation marks omitted)).

The Second Circuit also recognized the likelihood that Kimelman knew what sort of information he was dealing with in light of his background:

> As a former associate at a leading corporate law firm, Kimelman had to know that Goffer, in asking [questions about 3Com deal signature pages], was privy to the inner workings of a pending transaction to be aware of the status of signature pages.  Since Goffer had no legal basis to have access to such information, Kimelman must therefore have known or been aware of a high probability that this insider information was made available to Goffer in breach of a fiduciary duty.

*Goffer*, 721 F.3d at 125.

The trial record also abounds with evidence that Kimelman understood he was engaging in illicit activity that required discretion and concealment.  In the January 2008 call mentioned above, after Goffer made clear that he believed the company was "finalizing certain things up to close," Kimelman asked Goffer if he wanted to "go for the meeting right now in the street" rather than continue their conversation on the phone.   (JA 2620–21.)   In another recorded call a month later, after Goffer received the P.F. Chang's tip, Goffer told Kimelman he had information to share but "nothing [he was] going to talk about on the telephone," and Kimelman agreed to travel from Westchester to meet Goffer in Manhattan to "figure out [their] plan of attack." (JA 2631.)  And in May 2008, after Goffer received the Clear Channel tip, he called Kimelman seeking an "urgent [in-person] meeting," which Kimelman obliged without asking any follow-up questions, notwithstanding that he received the call in the middle of the afternoon on a workday

while it was pouring rain outside. (JA 2715.)

In addition to these in-person meetings, Kimelman and Goffer discussed printing out research materials to "justify[] a trade" should the purchases spark regulatory interest (JA 2638), and, when they purchased P.F. Chang's shares based on inside information, Kimelman and Goffer also purchased other restaurant companies' securities in an apparent effort to create the impression that they were betting on the industry as a whole rather than trading on inside information (*see* JA 2480, 2482; *see also* Trial Tr. at 849–50). Furthermore, at the August 2008 meeting recorded by David Slaine, Kimelman affirmed Goffer's assertion that Slaine "d[id]n't wanna know where [the tips were] coming from," wryly claiming that the source was the "[g]uy fixing that pothole" outside (JA 2789.8–9) – suggesting to Slaine, and the jury, that he too had adopted the see-no-evil approach that Goffer advocated and was urging Slaine to do the same. Indeed, the Second Circuit remarked that Kimelman's "additions to this conversation about the need for plausible deniability underscore[d] Kimelman's avoidance of knowledge as to Goffer's source." *Goffer*, 721 F.3d at 127. The same could be said with respect to Kimelman's avoidance of knowledge as to the benefit received by the source. These actions clearly support the inference that Kimelman believed his trades were illegal.

The nature of the information Kimelman received, the frequency with which he received it, and his clandestine behavior when discussing or trading on this information completely undermine the hypothetical suggestions set forth in Kimelman's briefs of possible nonculpable sources for the tips, such as "a fellow subway passenger who was unguardedly reviewing deal documents on his morning

commute" (Kimelman Mem. at 18), "a neighbor who carelessly discarded confidential documents in their building's trash" (*id.*), or a lawyer friend "commiserating about work" with Goffer (Kimelman Reply at 4–5). More to the point, a reasonable juror would have inferred from this evidence that Kimelman did not believe he was receiving inadvertently disclosed information, but rather that he knew he was receiving inside information from a lawyer or similarly situated professional who would face grave consequences if caught breaching that duty of confidentiality. *Cf. Newman*, 773 F.3d at 455 (acknowledging that "information about a firm's finances could certainly be sufficiently detailed and proprietary to permit the inference that the tippee knew that the information came from an inside source" and distinguishing "financial information [that] is of a nature regularly and accurately predicted by analyst modeling").

That conclusion in turn prompts an obvious question, indeed, the very question Craig Drimal asked Goffer when he heard that the tips came from a lawyer: why is the lawyer "risking his whole [expletive] career and maybe going to jail?" (JA 2737.) The answer to that question – whether explicitly asked by Kimelman or not – is equally obvious: a lawyer would not betray his client's most sensitive confidences – risking loss of employment and jeopardizing his ability to obtain comparable future employment – for no benefit to himself. And a reasonable juror would have inferred that Kimelman, a former M&A attorney, understood this. Moreover, as discussed above, the jury was not required, as Kimelman suggests, to find that Kimelman knew that the benefit was bags of cash – only that Kimelman knew or consciously avoided knowing that Goffer's sources were receiving a "direct or indirect" personal

benefit sufficient to satisfy *Dirks*, such as "a reputational benefit that will translate into future earnings" or the benefit received from simply having given a gift to a trading friend. *See Dirks*, 463 U.S. at 663–64. The Court finds that the trial record amply supports that inference.

Kimelman argues that *Newman* forecloses this result, since the Second Circuit opined that, in *Dirks*, "the Supreme Court affirmatively rejected the premise that a tipper who discloses confidential information necessarily does so to receive a personal benefit," *Newman*, 773 F.3d at 454 (citing *Dirks*, 463 U.S. at 661–62), and that, even if detailed evidence "could support an inference as to the *nature* of the source, it cannot, without more, permit an inference as to that source's improper *motive* for disclosure," *id.* at 455. (*See* Kimelman Mem. at 9–10, 15 n.7; Kimelman Reply at 4.) But Kimelman's argument ignores the "more" that sets this case apart from *Newman*. In *Newman*, the Second Circuit concluded that the inside information was "the same type of information" that Dell's and NVIDIA's corporate insiders "routinely selectively disclosed" to analysts. *Newman*, 773 F.3d at 455. The Second Circuit therefore found that "no rational jury would find that the tips were so overwhelmingly suspicious that [defendants] either knew or consciously avoided knowing that the information came from corporate insiders or that those insiders received any personal benefit in exchange for the disclosure." *Id.* Here, by contrast, the news that attorneys had drafted legal documents in support of an imminent merger is not the type of information those attorneys or their clients routinely share with non-insiders.[7] Thus,

*Newman*'s holding does not preclude the inference that Kimelman knew or consciously avoided knowing that his sources were insiders who were tipping for a personal benefit.

The record also supports an inference that Kimelman possessed the requisite knowledge based on a common-sense view of the totality of the evidence. *See Rivas v. Fischer*, 687 F.3d 514, 542 (2d Cir. 2012) (the actual innocence standard requires the court to "view[] the record as a whole" when making its "'probabilistic determination about what reasonable, properly instructed jurors would do'" (quoting *House v. Bell*, 547 U.S. 518, 538 (2006))). As the facts discussed above make clear, Kimelman, as a member of Goffer's "inner circle," operated hand in glove with Goffer in trading on the tips Goffer received. For instance, Goffer and Kimelman (along with Emanuel Goffer) engaged in similar trading patterns following tips received by Goffer regarding impending acquisitions of public companies. *See* 3Com, P.F. Chang's, and Clear Channel

---

[7] For the same reasons, the facts here are not sufficiently analogous to those in *Gordon v. Sonar Capital Mgmt. LLC*, 116 F. Supp. 3d 360 (S.D.N.Y. 2015), another case on which Kimelman relies. There, similar to the government in *Newman*, the plaintiff argued that the court could infer knowledge of a benefit to the tipper based on the facts that the tipped information – a public company's "advance quarterly revenue figures," *id.* at 362 – was "highly accurate," "always came in the same format," and "was of the type that companies usually keep confidential," *id.* at 366. The court disagreed, finding such evidence insufficient under *Newman* to establish that the tippee knew the information "was disclosed in breach of a fiduciary duty," "even if" that evidence "could support an inference that [the tippee] knew that the information originated from" an insider. *Id.* at 366. Here, as explained above, the highly sensitive nature of legal documents evidencing imminent public company acquisitions supports the inference that the tipped information did not come from just any insider, but rather a lawyer or similar insider who would be hazarding his livelihood by disclosing that information to an outsider (and thus would not do so for no benefit to himself).

trading discussed above; *see also Goffer*, 721 F.3d at 126 (discussing the "inner circle" and evidence from July 2007 showing that "the trio bought and profited from shares of Hilton Hotels shortly after Goffer received an insider tip" from another Schottenfeld trader). In addition, Goffer sought Kimelman's counsel on the meaning of sensitive merger-related documents that Goffer had received from "our guy." (JA 2666–67; *id.* ("we got that").) Moreover, "Goffer and Kimelman recruited David Slaine to join Incremental Capital," hoping he would "provide them with the financial backing to get their insider trading-fueled business off the ground." *Goffer*, 721 F.3d at 121. And during that recruitment effort, Kimelman urged Goffer to promise Slaine "great information" if Slaine were to join Incremental Capital. (JA 2567.) Furthermore, on multiple occasions, Kimelman and Goffer discussed measures to avoid detection, like creating a paper trail and trading discreetly. (*See, e.g.*, JA 2638; JA 2652–53.) The two men even shared a sense of humor about their see-no-evil approach to the sources of their inside information. (*See* JA 2789.8–9.)

In light of this evidence, there is little doubt that the jury would have inferred that when Goffer shared the fact that his sources were cash-hungry Ropes & Gray attorneys with individuals like Plate and Drimal – who were not in the "inner circle" and with whom Goffer was far less intimate than Kimelman – he also shared that information with Kimelman, and that it was Kimelman's cunning – not his innocence – that limited the direct evidence against him. *Cf. Goffer*, 721 F.3d at 126 ("[A] rational juror could readily infer from the trust that Goffer showed in Kimelman by asking him about the signature pages and the matter-of-fact manner in which Kimelman answered – without astonishment as to Goffer's knowledge or expression of concern about

the sensitivity of such information – that Kimelman shared a relationship of trust with Goffer that Plate did not.") Consequently, the evidence compels the inference that Kimelman – like his partners and fellow "inner circle" members Zvi and Emanuel Goffer – fully understood all aspects of the insider trading scheme.

Put simply, Kimelman has failed to show that, "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him," and therefore he has not demonstrated actual innocence. *Bousley*, 523 U.S. at 623 (internal quotation marks omitted). Thus, for the reasons set forth above, neither defendant has established a basis for excusing his procedural default.

IV. CONCLUSION

For the foregoing reasons, neither Goffer nor Kimelman has established an entitlement to habeas relief pursuant to 28 U.S.C. § 2255. Accordingly, IT IS HEREBY ORDERED THAT their respective motions to vacate their convictions are DENIED. The Clerk of the Court is respectfully directed to terminate the motions pending at docket numbers 315 and 328.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated:   January 17, 2017
         New York, New York

         *       *       *

The United States of America is represented by Brian R. Blais and Brooke E.

Cucinella of the United States Attorney's Office for the Southern District of New York, One St. Andrews Plaza, New York, New York 10007.

Defendant Zvi Goffer is represented by William Mallory Kent, 1932 Perry Place, Jacksonville, Florida 32207, and Yale Klat, 125 Maiden Lane, Suite 204, New York, New York 10038.

Defendant Michael Kimelman is represented by Alexandra A.E. Shapiro and Daniel J. O'Neill of Shapiro Arato LLP, 500 Fifth Ave., 40th Floor, New York, New York 10110.